GEORGE McGAFFICK, Plaintiff and Respondent, v. H. M.
LEIGLAND, et al., Defendants and Respondents, except
as to Leigland Company, Appellant, and Northwestern
National Bank of Minneapolis, Defendant and Respond-
ent. H. M. LEIGLAND, et al., Cross-Complainants and
Appellants, v. GEORGE McGAFFICK, et al., Cross-De-
fendants and Respondents, and Northwestern National
Bank of Minneapolis, Cross-Defendant and Respondent.
No. 9341.
Submitted April 17, 1956. Decided November 1, 1956.
303 Pac. (2d) 247.

(332)

Messrs. Swanberg & Swanberg, Great Falls, for appellant.

Mr. Ralph J. Anderson and Mr. Stanley P. Sorenson, Helena, for Mr. and Mrs. George McGaffick.

Messrs. Gunn, Rasch & Gunn, Mr. H. J. Luxan, Jr., and Mr. Thomas P. Patterson, Helena, for Union Bank & Trust Co.

Messrs. Loble & Loble and Mr. Gene A. Picotte, Helena, for Northwestern Bank of Minneapolis.

Mr. Randall Swanberg, Mr. Anderson, Mr. Luxan, Mr. Patterson, Mr. Picotte and Mr. Henry Loble argued orally.

THE HON. PHILIP C. DUNCAN, District Judge:

This is an appeal from a declaratory judgment entered in the district court determining the rights of the plaintiff, George McGaffick, and numerous others, under the terms of a written contract for remodeling plaintiff's office building.

Two separate motions to dismiss the appeal have been interposed by various respondents. Such motions challenge the sufficiency of the service of the notice of appeal, the sufficiency of the undertaking on appeal and the legibility and sufficiency of the transcript on appeal filed in this court. However, in view of the disposition here made of the cause such motions are denied.

The case arises out of the remodeling of a building in Helena, Montana, known as the Steamboat Block, which was and is owned by the plaintiff, George McGaffick.

In 1950, after negotiations with plaintiff, the Mountain States Telephone and Telegraph Company agreed to lease the building from Mr. McGaffick on what appeared to be a profitable arrangement, provided he would remodel it in a manner suitable for the company's use, but the work required for that purpose was extensive and required financing to its full extent by third parties, Mr. McGaffick having no money of his

own. Hence, before the execution of the lease, it became necessary to ascertain the cost of the remodeling. Consequently, Mr. McGaffick, through his engineering and architectural firm, Morrison-Maierle, of Helena, Montana, prepared a document entitled, "Instructions for Pre-bidding, Description of Items, and Bid Forms" and submitted them to several contractors informally, including appellants, and they were invited to submit bids for the work upon the forms contained. This appellants Leigland, among others, did, and the bids were opened February 14, 1951. This procedure was called a pre-bid and appellants' bid of $188,385.05 was the low one and they thus acquired a preferential right but not a firm contract.

On April 26, 1951, a contract for the remodeling of the building was entered into between plaintiff McGaffick, and appellants Leigland, arrangements having been made on that day through the Union Bank and Trust Company, of Helena, for financing by that bank and the Northwestern National Bank of Minneapolis, although the promissory notes and mortgage on the property to secure the financing were not executed by plaintiff and his wife until May 26, 1951, and the mortgage to the banks was not recorded until June 8, 1951.

On April 29, 1951, appellants did their first work on the project at Great Falls, actually starting at the site in Helena on May 1, 1951.

On March 1, 1952, the task was completed and acceptance was made by plaintiff, except as to minor details not material here.

During the course of the work, progress reports or estimates, six in all, were made and after submission to the financing banks, payments in the amounts of these reports, totaling $147,955.63, were made to appellants. A number of subcontractors and materialmen were not paid by appellants and a question developed as to how much was still owing appellants.

On April 25, 1952, plaintiff began this suit for a declaratory judgment to determine the rights and obligations of himself, the appellants, and others in the property and under the contract, alleging, among other things, that appellants had

failed to submit proof they had paid all subcontractors, that he had been unable to obtain from appellants a final statement for the work, that he had insufficient knowledge to form a belief as to the amounts due, if any, to subcontractors and materialmen, some of whom had filed liens on the property and foreclosure actions on the same; and that he tendered such amount as might be found due to appellants and the subcontractors and materialmen. In their reply pleadings appellants admitted that many of the subcontractors and materialmen were unpaid and alleged, among other things, that the total cost of the work was $292,864.87 upon which only said sum of $147,955.63 had been paid, leaving a balance owing appellants of $144,909.24, for which they had filed a mechanic's lien.

Besides the plaintiff McGaffick, who is a respondent here, and the defendants Leigland, who are appellants here, there were brought into the action either originally or afterwards the subcontractors and materialmen claiming liens, the surety company which furnished appellants' bond involved in the work, the two banks and telephone company heretofore mentioned, Mrs. McGaffick, and the Equitable Life Assurance Society.

During the trial the Equitable Life Assurance Society was dismissed as having no interest and all of the subcontractors and materialmen were disposed of by stipulation which allowed all of their claims in the amounts asked for totaling $62,860.99. The ultimate consequence of this dismissal and stipulation was to leave to the trial court solely the determination of the rights and obligations of the plaintiff McGaffick, the appellants, and the two banks, the banks being in the case to determine whether or not the mechanic's lien, if any, claimed by appellants was superior to that of the mortgage lien of the banks, and, if so, to what extent.

After the trial and submission of proposed findings and conclusions, the trial court entered its findings and conclusions and judgment, the net result of which was that it was thereby concluded that the total obligation of plaintiff to appellants was the sum of $200,373.97 upon which there had been paid

$147,953.63 leaving a balance payable of $52,418.34, that appellants and their surety company were indebted to the subcontractors and materialmen in the sum of $62,860.99 leaving and indebtedness due plaintiff from appellants and its surety company of $10,442.65, and that appellants had no lien on the property and were precluded from asserting any priority of lien upon the property over the mortgage lien of the banks.

Numerous specifications of error are made and the transcript, exhibits, and briefs are voluminous, but it seems that all of the problems raised, as between appellants and plaintiff, laying aside for later consideration the question of priority between any lien of appellants and the lien of the banks' mortgage, may best be resolved by beginning with what appear to be appellants' contentions, viz.: That under the pre-bid the appellants were to bid only on the items specifically described and were not to include any items that might be inferred; that this is exactly what appellants did and their bid of $188,385.05 only includes such specific items; that the plaintiff represented the pre-bid plans and specifications were nearly perfect and they would not vary more than five per cent from the final plans and specifications, and if there was any variance the pre-bid filed by the contractor would be revised to take care of the variance; that in fact the final plans and specifications required a great deal more work than that so required by the pre-bid plans and specifications; that under the contract the $188,385.05 is the amount of money to be paid for the performance of the work described in the pre-bid plans and specifications, and not the amount of money to be paid for the work finally required, and, in making adjustments for additional work required under the final plans and specifications, only such unit prices as are given in the pre-bid will be used as a basis for adjustments, and where no unit price is given in the pre-bid, adjustment should be made on a *quantum meruit* basis; that the provision in the final contract regarding written orders for extra work is not to be considered for a number of reasons; i. e., (a) gratuitously inserted; (b) waiver

338

by plaintiff; (c) no extra work involved, it is additional work and either specifically set forth in the final plans and specifications, or necessarily to be implied therefrom; that on the basis of the foregoing rules the trial court far underestimated the amount due appellants; that the trial court erred in apparently applying the unit system to all the items contained in the pre-bid, whether or not the pre-bid itself set out a unit price, and in not permitting inquiry of plaintiff's engineer as to eighteen items he mentioned as not being included in his testimony with regard to additional work; that while the testimony of both parties involved an analysis of each of the items described in the pre-bid, together with explanations of any changes and assertions of value of the work, the plaintiff's estimates were in gross and not analyzed and were accepted by the court, although the appellants, in contrast, went into great detail on each item, and where certain work was eliminated and another sort of work done, the appellants analyzed the work originally called for and the work as finally called for, comparing the difference, rather than stating the work done was compensated for by the elimination of other work.

The important provisions of the documents involved in the foregoing contentions appear to be the following pre-bid documents:

"Instructions for Pre-Bidding,
"Description of Items, and Bid Forms
"February 14, 1951
"Instructions to Bidders

"*General.* Bidders are requested to study carefully and conform to these 'Instructions to Bidders' in order that their proposals be regular, complete and acceptable.

"*Proposals.* All proposals shall be made on the forms provided. All proposals shall be legibly written in ink or typewritten.

"*Examination of Site of Work.* Each bidder must examine for himself the location and extent of the proposed work and

determine any unusual conditions or hazards to be met in performing the work.

"*Intent of Bid.* The bid being taken at this time is a 'pre-bid'; the total cost of the project as given in this 'pre-bid' will be the basis upon which the Owner will finance the proposed remodeling. Therefore, it is imperative that the bids received at this time will be within five per cent of the ultimate cost of the project, providing the items and quantities as given herein on the Scope of Work and Bid Form do not vary more than the above mentioned five per cent.

"*Plans and Specifications.* After the pre-bids are received and financing of the project is arranged, plans and specifications will be prepared for the proposed work.

"*Preference Given to Low Bidder.* The low and best bidder (based upon the pre-bid) will be given preference in the awarding of the work. After completion of the plans and specifications, the Contractor shall revise his bid in accordance thereof. The unit prices bid in the pre-bid will be used as a basis of comparative costs per item between the pre-bid and the ultimate price, and any adjustments required will be made on this basis.

"*Qualifications of Bidders.* Bidders will be required to submit satisfactory evidence that they have a practical knowledge of the work bid upon, and that they have the necessary financial resources to complete the proposed work. Due consideration will be given to the present ability, reliability, and general reputation of each of the bidders.

"In addition to the above (due to the shortage of certain materials), each Contractor should enumerate the amounts of materials on hand, or the availablility of same, as called for or required by the proposed work, and due consideration will be given therefor in the selection of the best bidder.

"*Acceptance or Rejection of Proposals.* The Owner reserves the right to reject any or all bids.

"Only one proposal will be accepted from one firm or association. Any evidence of collusion between bidders or of one

firm having an interest in more than one proposal may constitute a cause for rejection of any bids so affected.

*"Complete.* It is the intent that all of the items and quantities given in the pre-bid include every kind of equipment and accessories, all items and quantities of material and labor in any way essential to constitute a thorough compliance with the requirements indicated, specifically or through reasonable inference, finished and ready for the Owner's use without further additions of any nature.

*"Performance Bond, Insurance, etc.* The successful bidder will be required to furnish a surety bond in the amount of 100% of the contract price. He will be required to carry compensation insurance and full liability· insurance with limits for personal injury of $10,000.00 and $20,000.00 and property damage limits of $5,000.00 and $25,000.00.''

''Contract Agreement

''This Agreement, made the 26th day of April in the year 1951, by and between Leigland Company, a co-partnership hereinafter called the Contractor, and George McGaffick, 31 East Lyndale Avenue, Helena, Montana, hereinafter called the Owner, Witnesseth, that the Contractor and the Owner for the considerations hereinafter named, agree as follows:

''Article 1. Scope of the Work. The Contractor shall furnish all of the materials and perform all of the work as shown on the Drawings and described in the specifications, entitled 'Remodeling Steamboat Block' located at 622 Helena Avenue, Helena, Montana, prepared by Morrison-Maierle, Inc., Consulting Engineers, acting as, and in these Contract Documents entitled the Engineer; and shall do everything required by this Agreement, the General Conditions of the Contract, the Specifications and the Drawings.

\* \* .\* \* \* \*

''Article 3. The Contract Sum. The Owner will pay the Contractor for the performance of this Contract, and the Contractor will accept in full compensation therefor, (except as hereinafter stipulated)· the sum of One hundred eighty-eight

thousand three hundred eighty five and 05/100 dollars ($188,-385.05) based on the items and quantities described, and the prices stipulated in the 'pre-bid' taken on and dated February 14, 1951, entitled 'Description of Items, and Bid Forms, Steamboat Block, Helena, Montana'. The above written contract price shall be adjusted in accordance with the items and quantities required by the plans and specifications, and the unit prices given in the 'pre-bid' will be used as a basis of adjustment. * * *''

''Specifications for remodeling Steamboat Block'' which are made a part of the Contract Agreement by Article VI thereof.

*''Extra Work*

''The Contractor shall perform extra work, 'for which there is no quantity and price included in the contract, whenever the same is ordered in writing by the Engineer, and such extra work shall be done in accordance with the specifications therefor, or as directed. Such work will be paid for at a price to be agreed upon previously in writing by the Contractor, Owner, or the Engineer. The Owner, George McGaffick, shall not pay for, nor shall he be liable for, any extra work performed in the absence of or prior to a written authorization or order by the above mentioned parties to the Contractor covering such work.''

Now, it appears to us, with reference to appellants' contention, that under the pre-bid the appellants were to bid only on items specifically mentioned and were not to include any items that might be inferred, that such contention is without basis in fact. The provision entitled ''Complete'' of the pre-bid documents containing as it does the clause ''or through reasonable inference'' seems susceptible to no other reasonable construction than that appellants, as bidders, were required to bid, not only on specific work but on work provided in the pre-bid plans and specifications through reasonable inference. It must be noted that the pre-bid documents also contained the clause ''Examination of Site of Work'' and that S. A. Leigland of the appellants admittedly made such an examination

of the premises prior to submitting his pre-bid in the company of an employee of the engineering firm that prepared the pre-bid plans and specifications, and that Mr. Leigland questioned this man concerning the work to be done and had no complaint to make concerning the answers. This construction, contrary to that of appellants is also supported by independent expert testimony of a contractor of experience, and it is further supported by the surrounding facts. It was expressly found by the trial court and it is undisputed that plaintiff was entirely without funds to do the work, and, if it was to be done at all, it had to be entirely financed by third parties, and that this fact was known to appellants from the beginning, it even appearing that appellants themselves made an effort to secure financing for the plaintiff from a Great Falls bank before it was finally secured from the two banks heretofore mentioned. It was further known, perforce, to appellants by a reading of the clauses heretofore set out of the pre-bid documents, that the pre-bid plans and specifications were not complete. From these basic known facts it was not reasonable for appellants to suppose plaintiff was asking for bids only on specifically described items, but on the whole project as it was to be finally completed, and while this does not require a contractor to be a mind reader, it would necessarily include items to be reasonably inferred. Otherwise, it could very likely be that the ultimate cost of the project, though reasonably forseeable by appellant contractors, would be far more than the total of the financing procured or procurable with resultant disastrous financial consequences to all concerned. It is not to be presumed that any such consequences were within the contemplation of the parties, but rather the contrary.

Allied with the foregoing is the contention of appellants that plaintiff represented the pre-bid plans and specifications as nearly perfect and they would not vary more than five per cent from the final plans and specifications, and if there was a variance the pre-bid filed by the contractor would be revised to take care of the variance. Rather than being a representation

that the pre-bid plans would not vary more than five per cent from the final plans, it seems to us that the wording of the clauses quoted of the pre-bid documents, particularly the clause entitled "Intent of Bid" constitute a warning to the contractors that the pre-bid made by them must be within five per cent of the ultimate cost of the project as shown by the pre-bid plans and specifications in order that any financing obtained as a result of his pre-bid would be sufficient, and this is an additional ground for holding that the proper construction of the pre-bid is that appellants were required to include in their pre-bid not only specifically described items, but items to be reasonably inferred. Proceeding further with this last contention of appellants, the appellants not only contend that the plaintiff represented the pre-bid plans and specifications were nearly perfect, with which contention we do not agree as seen, but that if there was any variance, the pre-bid filed by the contractor would be revised in order to take care of the greater or lesser amount of work required by the final plans and specifications. Just what meaning appellants attach to this last portion of this contention is not clear, but if they mean by it that revision can be made to the extent of converting the contract into a cost plus ten per cent arrangement, which will be discussed at greater length later on, or into any other sort of agreement at direct variance with the contract made, such contentions cannot be upheld. The clause of the pre-bid upon which appellant relies, entitled "Preference Given to Low Bidder", reads, "* * * After completion of the plans and specifications, the Contractor shall revise his bid in accordance thereof."

The burden was on the appellants to revise their bid upon ▮ receipt of the final plans and specifications. The evidence is that the final plans and specifications were in appellants' hands a few days after commencing work and before they had involved themselves to any considerable extent. The evidence likewise is convincing, although appellants dispute it, that appellants were fully aware of and very familiar with the final plans and specifications in detail on the day they signed the

contract. The evidence also is to the effect that appellants themselves were responsible for beginning the work prior to the time the plans and specifications were finally ready, being extremely desirous of securing the job and beginning work. The appellants at no time ever revised their bid. They must, therefore, have been satisfied with the contract they signed. In any event they were under no obligation to proceed with the work at all without revising their bid or even entering into the contract if it was their belief that the final plans and specifications were so changed from the pre-bid plans and specifications as to make the pre-bid inapplicable. But they did proceed without bid revisions, objection or question, so far as we can determine, for several months leaving plaintiff to understand that they were proceeding with the work under the contract. That this is so is further buttressed by the six progress reports or estimates signed and filed by appellants over an extended period of time and hereafter described in greater detail. Under these circumstances appellants cannot now assert that the contract shall not determine their rights.

This brings us down to the point of considering the adjustments that should be made under the contract for the work required and done under the final plans and specifications as against that required under the pre-bid. If we accept appellants' contention that under the contract the $188,385.05 is the amount of money to be paid for the performance of the work described in the pre-bid plans and specifications, and, in making adjustments for the work required under the final plans and specifications, only such unit prices as are given in the pre-bid will be used as a basis for adjustments, and where no unit price is given in the pre-bid, adjustment should be made on a *quantum meruit* basis, it at once becomes evident from a review of the many items upon which appellants claim adjustment, and which review cannot possibly be set forth here because of the undue length to which it would extend this opinion, that very many, if not most of them, are included, either directly or by reasonable inference in the pre-bid plans and

specifications. This immediately disposes of such items, it having heretofore been seen that appellants' pre-bid covered not only specific work described in the pre-bid plans and specifications but work to be reasonably inferred therefrom.

As to the remainder of the items upon which the appellants claim adjustment, we are not disposed to interfere with the trial court's findings. It is true that the evidence in support thereof is conflicting, but a review of all the evidence does not disclose that plaintiff's evidence is so contradictory in itself or contrary to physical facts as to be unworthy of belief, while that of appellants has a decided trend in that direction.

In the first place, attached to appellants' cross complaint as Exhibit ''A'' is their lien statement filed May 5, 1952, against the property in which appellants set forth the various items involved in the remodeling, such as materials, labor and subcontracts. The purported actual cost to them of each item is mentioned and a profit of ten per cent is added to the total cost of each item. In other words, this statement of account is on a strict actual cost plus ten per cent basis and the grand total of all of it is $292,864.87. As heretofore stated, appellants' contention and theory at the trial and on this appeal is that under the contract the pre-bid of $188,385.05 is the amount of money to be paid for the performance of the work described in the pre-bid plans and specifications, and not the amount of money to be paid for the work finally required, and, in making adjustments for additional work required under the final plans and specifications, only such unit prices as are given in the pre-bid will be used as a basis for adjustment, and where no unit price is given in the pre-bid, adjustment should be made on a *quantum meruit* basis. The greater portions of appellants' evidence is concerned with their analysis, both oral and reduced to writing in their Exhibit 25, purporting to be in accord and in support of this theory and contention and in accordance with the contract of April 26, 1951. The total figure arrived at by appellants by this means is also the sum of $292,864.87, exactly the same as the figure arrived at in

the lien statement which was prepared on a strict actual cost plus ten per cent basis. How this could so precisely be without the gift of clairvoyance is difficult to perceive even though it be conceded that the pre-bid was made on a cost plus ten per cent basis.

Next, on a number of items upon which appellants now claim far-reaching adjustments by their analysis, it does not appear that this was their contention in their progress estimates or reports hereafter gone into in more detail as previously stated. One example of several is the item "demolition". On each of the last three reports, being the only ones to mention this item, the main bid is set forth, and it is the amount of the pre-bid of $6,425, then completion is stated as one hundred per cent and the amount due is stated as the amount of the pre-bid. Despite these statements in the progress reports made during the time the contract was being performed, the appellants now claim on this one item alone $14,213.78, or an additional $7,-788.78.

Further on it appears that appellants, by their analysis heretofore mentioned and upon which their case chiefly rests, claim a total of 190 hours labor on two items, yet on cross-examination timecards for only thirty-four hours could be produced. And, in this connection, it might also be mentioned that the written analysis, Exhibit 25, was prepared by S. A. Leigland, and, in support of it, the appellants relied entirely upon the oral testimony of S. A. Leigland, a very interested party, being one of the two partners of the appellant partnership. There are no records, books, statements, invoices, vouchers, timecards, job tickets or other documentary evidence. It may be that this was to save a wearing task and that such documentary evidence was available to support the written and oral analysis, but the record does not appear to so show, and while their production might lend more credence to appellants' evidence, their non-production does not.

Many more matters could be mentioned pointing up inherent contradictions and discrepancies in appellants' testimony, such

as that the total of the figures set forth in the analysis as "allocated overhead", in connection with items appellants claimed were not covered by unit prices, was greater than the total of the overhead items set forth in the lien statement which purports to contain all of the overhead items chargeable to this project, but we believe that the matters already mentioned are sufficient for the purpose indicated.

But two other matters remain to be mentioned before ad-
**[3]** to that portion of the case in which the banks are concerned. One of them is the matter of "extra work" and the other is the claimed error in not permitting inquiry of plaintiff's engineer witness as to eighteen items. First, with regard to the "extra work", if there was "extra work" done, there is no showing of any kind that the requirements of a written order for the same were ever obtained from the plaintiff or that the requirement was ever waived by him. As to the statement that it was "gratuitously inserted" in the final plans and specifications, the evidence is convincing, as stated, that appellants were aware of the contents of the final plans and specifications when they signed the contract.

There remains to be considered the question as to what ex-
 the mechanic's lien, if any, of appellants may be prior and superior to the lien of the mortgage of the two banks. Assuming that appellants do have a mechanic's lien, it seems to be admitted that by virtue of R.C.M. 1947, section 45-504, and decisions of this court thereunder, that such a lien takes precedence over the banks' mortgage to the extent of the pre-bid of $188,385.05 plus such additional compensation as may be allowed by the court up to but not exceeding five per cent of the pre-bid, less the $147,955.63 already paid by the banks, or a net amount of $49,848.67. However, the banks do contend that appellants are estopped in equity from claiming any prior lien for any greater amount, and we believe this to be true.

As has already been stated, at the time appellants made their pre-bid the plaintiff was without any funds of his own to do the work and appellants were well aware of this situation and

knew that it was necessary for plaintiff to secure financing for the full cost of the project, and that appellants could not be assured of any contract until the financing had been arranged. Despite this knowledge appellants were anxious to get the job as they admit and is evidenced by the fact that on March 8, 1951, at the instance of appellants, plaintiff gave his written consent to begin construction work in advance of the execution of the contract with the provision that if plaintiff was unable to secure financing he would not be liable for any work done, and even at the bank meeting of April 26, 1951, hereafter mentioned, appellants executed an agreement stating that they were anxious to commence operations and would not hold plaintiff liable for any work done prior to May 15, 1951, if plaintiff was unable to secure financing, and also by the fact previously mentioned appellants attempted sometime before the making of the contract on April 26, 1951, to secure financing for plaintiff from a Great Falls bank. Also, as previously mentioned, the evidence is convincing, although appellants dispute it, that appellants were fully aware of and very familiar with the final plans and specifications by April 26, 1951. Further, the evidence is uncontroverted that the banks were not willing to make a loan on the project in excess of $210,000 and that both plaintiff and appellants were advised of this and that this was all the money that was available for the remodeling.

On April 26, 1951, a meeting was held at the Union Bank and Trust Company. Mr. McGuinness testified as to what took place at that meeting, in part, as follows:

"Did you meet with Mr. McGaffick on April 26, 1951?

"A. Yes, sir.

"Q. Who called that meeting? * * * A. Mr. Sherman Smith, Mr. McGaffick's attorney, called me on the morning of April 26th, stating that Mr. McGaffick and Mr. Leigland were in his office and that they had arrived at some figures relative to the remodeling of the Steamboat Block, and desired to have a meeting with the bank relative to financing the project.

"Q. Was that meeting held? A. Yes, sir.

"Q. And where was that meeting held? A. Conference room at the Union Bank.

"Q. And who was present at that meeting? A. Mr. Smith, Mr. McGaffick, Mr. Leigland.

"The Court: Which one?

"Witness: Selmer.

"A. (Continuing) Mr. Morrison, Mr. Luxan, Mr. Patterson and myself.

"Q. After all those persons were in attendance at the meeting, was the purpose of the meeting stated? A. Mr. Smith stated the purpose of the meeting as a desire on behalf of McGaffick to discuss financing of the remodeling project at the Steamboat Block.

"Q. Was the final cost of the remodeling of the Steamboat Block stated by Mr. Leigland at that meeting? A. Yes, sir.

"Q. Can you give the circumstances of that statement? Was it in response to question or was it a statement? A. It was in response to a question. After some discussion I asked 'Mr. Smith, just what figures have you got', he said 'Mr. Leigland will handle this job to completion for $188,385.05'. He asked Mr. Leigland, who was across the table, 'Is that right', Mr. Leigland said 'Yes', and Mr. Morrison turned to Mr. Leigland and he said 'Can you do that job for that price?', Mr. Leigland said he could, and Mr. Morrison said 'You mean with a five per cent more or less included', and Mr. Leigland said 'Yes'.

"Q. After this statement was made, did Mr. Leigland make any further statement pertinent to the construction work on the Steamboat Block? A. Yes, sir; there was some discussion of plans being in transit as between the proposed lessee and the architect's office; there was a discussion of two sheets of those plans which had not yet been completely completed. I asked Mr. Leigland 'How can you be sure of your figures when the last two pages of those plans aren't even out yet', he replied 'I know what's on those sheets, I have spent more time at

the Morrison's office in the last two weeks than I have in my own office, I'm sure of the figures'.

"Q. Did he make any further statement in regard to those figures? A. Yes, sir. I said 'You're sure of those figures', and he said, 'I'm so sure of them that I have entered into a side agreement with George'. I inquired 'What is the nature of that side-agreement', he said 'George will tell you'. At that point we were interrupted by the other people and I didn't get a chance to talk to him any further that morning."

These statements attributed in the foregoing testimony and ▮ corroborated by other witnesses to S. A. Leigland constitute representations to the banks that the final cost of the remodeling in accordance with the final plans and specifications would not exceed by more than five per cent the sum of $188,385.05. It is true that Mr. Leigland denies making any statements with reference to the final plans and specifications and the cost of the work based thereon and contends that any statements he did make referred to the pre-bid plans and specifications, but the trial court found against appellants on this point, and, we believe correctly so, all the surrounding circumstances considered.

Following the meeting of April 26, 1951, appellants, as principal, executed a performance bond dated May 28, 1951, *in the penal sum of $188,385.05* with defendant surety company as surety and plaintiff and the two banks as obligees, and deposited the same with the banks, all in evident compliance with the requirements in the final specifications that appellants provide a bond "for the full amount of the contract price", and this act constituted a further representation by appellants to the banks that the final cost of the project would not exceed by more than five per cent the pre-bid of $188,385.05.

After the furnishing of the bond the six progress estimates or reports heretofore referred to were submitted to the banks over a period of many months at or about the date each bears, that is, June 7, 1951, July 17, 1951, October 2, 1951, November 7, 1951, December 12, 1951, and January 9, 1952, and short-

ly after the receipt of each of these estimates the banks paid the amount shown to be due therein, disbursing in all on account thereof $147,955.63. No other estimates or demands were ever submitted to the banks. All of the estimates were on appellants' own stationery and signed by them. Except for the first two they were all prepared in detail and all but the last two state the "contract price" to be $188,385.05. The fifth· estimate refers to "Pre-bid Contract" price as $188,385.05 and the sixth estimate omits reference to the total price, but none of the estimates contain any indication with respect to any of the twenty-three items enumerated that an amount in excess of the amount pre-bid for such items will be claimed. On the contrary, the estimates show as the "amount due" for those items which were one hundred per cent complete (of which there were twelve as of the date of the last estimate) the exact amount of the pre-bid for such items. The situation concerning the item "demolition" has already been described. The same remarks apply generally to the other items on which appellants are now asking for additional compensation. Additionally, none of the estimates show that any extra or additional work was performed or that any extra or additional material was furnished for which appellants were entitled to extra compensation, all of which appellants now claim. Thus these progress or estimate reports, too, amounted to representations to the banks that the final cost would not exceed $188,-385.05 by more than five per cent.

Added to all these matters is the fact that appellants never submitted any revised bid after the plans and specifications were completed as they were required to do.

Now these representations were made despite appellants' knowledge, already stated, that no loan would have been made by the banks if they had any information the project might cost over $210,000, and if the appellants knew on April 26, 1951, that the cost would exceed the pre-bid by more than five per cent it is patent that it was their clear duty, even contractual duty, in light of their expected and actual participation in the

proceeds of the loan, to advise the banks of that fact. Yet they never did, although on April 26, 1951, appellants should have known, if they ever did, that the cost would be more than five per cent of the pre-bid. As previously found, by April 26, 1951, appellants were fully aware of and very familiar with the final plans and specifications and consequently were chargeable with knowledge of any deviations from the pre-bid plans and specifications whereby appellants would become entitled to compensation over the pre-bid figure. And, even if appellants had only made a casual examination of the final plans and specifications, as they contend, but which this court has found against, that statement is at odds in result with appellants' own brief wherein it is said: "It requires only a cursory examination of these documents to be convinced that the work required by them was far in excess of that required by the pre-bid plans and specifications * * *"

It is not only clear that appellants never advised the banks that the cost might exceed the pre-bid by more than five per cent, but that the banks never knew of any such possibility until after payment of the last estimate in January of 1952, and excusably so. It is true that the banks had a copy of the contract and presumably understood its contents, particularly the part having to do with adjustment of the price. Nevertheless, it must be remembered that the sole purpose of the April 26, 1951, bank meeting was to consider the financing of the project and the one point of vital concern to the banks was the extent of adjustment necessary in the price since the funds were definitely limited, and that at the meeting they had the assurance of the contractor, S. A. Leigland, on behalf of appellants, as previously found, that no adjustment in excess of five per cent of the pre-bid would be required.

From what has been said, including the statement that appellants knew they would participate in the proceeds of any loan that was obtained, there can be no doubt that the representations made by appellants to the banks were made with the intention that the banks would act upon them. It fur-

ther appears that the banks did act upon them, not once but repeatedly. It is uncontradicted that at the close of the bank meeting of April 26, 1951, the banks verbally committed themselves to the construction loan and thereafter procured the mortgage and notes, the same being taken after the execution of the performance bond, and made the six separate payments on the progress or estimate reports. It also appears that the banks will be damaged if the appellants are permitted to assert any lien in excess of $188,385.05 plus five per cent less the sum of $147,955.63 heretofore paid for the reason that out of the $210,000, the amount of the mortgage, $12,195.70 has already been spent for other necessary costs, such as architect's fees, title expense, and clearing up back taxes and old mortgages to make the project feasible in the first instance. It is evident that every element of equitable estoppel is present in this case. See R.C.M. 1947, section 93-1301-6, subd. 3; Lindblom v. Employers' Liability Assurance Corporation, 88 Mont. 488, 295 Pac. 1007; City of Billings v. Pierce Packing Co., 117 Mont. 255, 161 Pac. (2d) 636; Mundt v. Mallon, 106 Mont. 242, 76 Pac. (2d) 326.

As to cases holding that active participation by a contractor in procuring a construction mortgage loan to be made will prevent him from claiming his mechanic's lien is prior to the mortgage lien, even though the mortgage was filed subsequent to the work see Ponder v. Safety Building and Loan Co., 59 S.W. 523, 22 Ky. Law Rep. 1074; Heide v. Societatea Romana De Ajutor Si Cultura Banatiano, 262 Mich. 394, 247 N.W. 702. Cases to the same effect involving representations made by the contractor to the mortgagee, similar to those in the case at bar, whether such representations be by words, writings, silence or conduct, are Higby v. Hooper, 124 Mont. 331, 221 Pac. (2d) 1043; Fullerton Lumber Co. v. Miller, 217 Iowa 630, 252 N.W. 760; Commercial Loan & Building Ass'n v. Trevette, 160 Ill. 390, 43 N.E. 769; Planters' Lumber Co. v. Griffin, 157 Miss. 714, 124 So. 479, 128 So. 76; Reimann Construction Co., Inc. v. Upton, La. App. 1938, 178 So. 528.

Likewise appellants are estopped from asserting that any ▮ mechanic's lien they may have is prior and superior to the banks' mortgage by reason of the performance bond given by them and heretofore mentioned. The bond is executed by appellants, as principal, the defendant surety company, as surety in, favor of plaintiff and the two banks, as obligees, "as their interests may appear", guaranteeing to defend, indemnify and save harmless the banks against any and all liens, encumbrances, damages, claims, demands, expenses, costs and charges of every kind, arising out of or in relation to the performance of the work upon the property, and, further, that such obligations would be valid, notwithstanding any change, extension of time, alteration or addition to the terms of the contract, or the work to be performed thereunder, or the specifications accompanying the same.

By the terms of the bond, the appellants guaranteed the banks, as obligees, to save the banks harmless from any and all *liens* and *encumbrances* upon the property. This bond, therefore, in and of itself estops appellants from asserting the priority of any lien of theirs over the banks' mortgage. Compton v. Conrad, 203 Mo. App. 211, 209 S.W. 288; Stumbaugh v. Hall, Mo. App., 30 S.W. (2d) 160. And see Aikens v. Frank, 21 Mont. 192, 53 Pac. 538, wherein, it was held that a surety on a building contractor's bond cannot himself enforce a mechanic's lien against the property. Also see Simpson v. Bergmann, 125 Cal. App. 1, 13 Pac. (2d) 531; Miller v. C. C. Hartwell Co., 5 Cir., 271 F. 385; Ganahl v. Weir, 130 Cal. 237, 62 Pac. 512; Pinning v. Skipper, 71 Md. 347, 18 A. 659.

What has already been written disposes of all the appellants specifications of error save the sixth. There complaint is made of the trial court's refusal to permit inquiry by the appellants' counsel (1) into the changes made in the work after the delivery of the final plans and specifications, (2) in sustaining objections to all questions touching items not found in the final plans and specifications, and (3) in not allowing inquiry on the cross-examination of the plaintiff's engineer specifically into

some eighteen changes which it is said admittedly were made in the final plans and specifications as originally submitted. These rulings all occurred during the presentation of the case for the plaintiff McGaffick. Thereby there was excluded from that case all testimony relating to departures from the final plans and specifications which the appellants claim were made during the course of the work done by them thereunder.

Otherwise stated, it is clear from the record that by these rulings the trial court did not exclude any evidence tending to disclose differences between the pre-bid specifications of February 14, 1951, and the final plans and specifications which were a part of the contract of April 26, 1951. It follows then necessarily that these rulings were correct; the specification of error made thereon without merit for at least two reasons.

First, the issue that the final plans and specifications were materially altered after work had begun and after the contract of April 26, 1951, had been closed was tendered, if at all, by the appellants in their cross-complaint. Evidence to sustain that issue was then properly no part of the case for the plaintiff McGaffick. The inquiry which the appellants' counsel proposed to make as this specification of error points out was therefore not proper cross-examination upon any material matter brought out in McGaffick's case or properly reaching that case.

Nor was that case altered because the plaintiff's witness had testified that certain changes which he had mentioned "were not all of the changes that were made in the work." The reference at this point was again to departures from the final plans and specifications made after their delivery to the appellants and after they had begun work thereunder; and appellants' counsel so understood this testimony. But this statement by this witness was at the time likewise wholly immaterial with no relevancy whatever to any issue then before the court upon which evidence was admissible, primarily because there was no foundation laid either in the plaintiff's pleadings or in the evidence thus far adduced in his case. It follows

that cross-examination upon this immaterial testimony was also immaterial. Indeed a contrary ruling would have brought added confusion into a record which at best is confusing enough because of the multitude of claims and counterclaims which make up this controversy.

Secondly, if there were error in any of these rulings as the appellants' specification of error asserts, that error on this record was without prejudice. It is doubtful that the appellants' pleadings under which the cause was tried below are broad enough to admit evidence of the subsequent alteration of the terms of the final contract of April 26, 1951, either consistent with its terms, or with R.C.M. 1947, section 13-907, which is directly applicable, or with any theory that the plaintiff McGaffick waived either the express stipulations of that contract or the impact of that statute. But in any event in the course of the appellants' case they were given every opportunity to present all the evidence they had tending to show that the final plans and specifications of April 26, 1951, were not followed in the remodeling of the Steamboat Block, and that the responsibility for any such departures lay with the plaintiff McGaffick. The trial court nowhere denied counsel in their presentation of that case the right to lay a proper foundation for such evidence, if they had any, and thereon to offer the evidence itself.

Further, if they wished to pursue this inquiry, they should have called McGaffick's engineer as an adverse witness for examination in the appellants' case under R.C.M. 1947, section 93-1901-9, where properly their questions to the point here should have been pressed, if at all. They did not choose to do so; and on this record the inference is irresistible that they could not have hoped for success, had they done so. That the appellants' counsel have failed to make a case upon any permissible theory is not sufficient to put the trial judge in error where from the whole record it abundantly appears he gave them every opportunity to bring forward all the relevant evidence they had.

The judgment is affirmed.

MR. CHIEF JUSTICE ADAIR, and MR. JUSTICES ANGSTMAN, DAVIS and BOTTOMLY, concur.

MR. JUSTICE ANDERSON, deemed himself disqualified.