413 S.E.2d 156

Daphne Colleen PASQUALE, Personal Representative of the Estate of Michael David Pasquale, Plaintiff Below, Appellee,

v.

OHIO POWER COMPANY, an Ohio Corporation, and Central Operating Company, a West Virginia Corporation, Defendants and Third–Party Plaintiffs Below, Appellants.

GALLIA REFRIGERATION, INC., aka Pasquale Electric Company, an Ohio Corporation, Defendant Below, Appellee,

v.

The TRAVELERS INSURANCE COMPANY, a Connecticut Corporation; the Travelers Indemnity Company, a Connecticut Corporation; and the Travelers Indemnity Company of Rhode Island, a Rhode Island Corporation, Third–Party Defendants Below, Appellees.

No. 19940.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 18, 1991.

Decided Dec. 19, 1991.

---

Harvey D. Peyton, Calwell, McCormick & Peyton, L.C., Nitro, Ronald R. Morgan, II, Pt. Pleasant, for the appellee Daphne Colleen Pasquale.

John M. Slack, III, Gale R. Lea, Jackson & Kelly, Charleston, for the appellee Gallia Refrigeration, Inc.

Timothy M. Miller, R. Clarke Vandervort, Robinson & McElwee, Charleston, for appellants Ohio Power Co. and Cent. Operating Co.

Michael J. Farrell, Charlotte A. Huffman, Jenkins, Fenstermaker, Krieger, Kayes & Farrell, Huntington, for the appellee The Travelers Ins. Co., The Travelers Indem. Co., and the Traverlers Indem. Co. of Rhode Island.

MILLER, Chief Justice:

Ohio Power Company and Central Operating Company (the Power Companies) ap-

peal a final order of the Circuit Court of Mason County, dated February 6, 1990, dismissing their third-party claims against Gallia Refrigeration, Inc., also known as Pasquale Electric Company, and their third-party complaint against The Travelers Insurance Company (Travelers) for a declaration of coverage. We find that the trial court did err in granting summary judgment, and, accordingly, the trial court's final order is reversed.

## I.

The Philip Sporn electric generation station (the Sporn plant) is a coal-fired electric generating plant located in Mason County, West Virginia. The Sporn plant, while operating as one integrated electric generating plant, has five generating units, referred to as Units 1 through 5. The units are separately owned by Ohio Power Company and Appalachian Power Company. The entire plant is operated by Central Operating Company under a contractual agreement with the owners.

Although the plant has a maintenance staff, certain maintenance work is performed by independent contractors. One of those contractors is Pasquale Electric, a company owned and operated by Louis Pasquale. Pasquale Electric had performed several maintenance projects at the Sporn plant, and each time the parties entered into a written service contract. These contracts typically incorporated certain general terms and conditions, including provisions that Pasquale Electric would indemnify and hold harmless the Power Companies for accidents occurring during the performance of maintenance work on plant premises and a requirement that Pasquale Electric would maintain liability insurance.

On June 26, 1987, the Power Companies and Pasquale Electric entered into a contract to do maintenance work on Unit No. 5. On and prior to August 19, 1987, Pasquale Electric's employees were on the premises performing work under that contract. At the same time, Pasquale Electric was waiting to see if it had been awarded another service contract with the Power Companies for work on Unit No. 2, which was owned by Ohio Power Company. As in the June 26 contract, that contract, which was later dated August 25, 1987, provided that Pasquale Electric would indemnify the Power Companies for any liability arising as a result of the maintenance work.

On or about August 18, 1987, a short circuit occurred in a cable that was connected to a boiler feed pump in Unit No. 2. Because the boiler feed pump needed to be made operational as soon as possible, the Sporn plant management asked Pasquale Electric to pull some of its employees from Unit No. 5 to work on the cable at Unit No. 2. One of the employees who was removed to work on Unit No. 2 was Michael Pasquale, Louis Pasquale's nephew. While working on Unit No. 2, Michael Pasquale erroneously cut an energized cable and was instantly electrocuted.

Michael Pasquale's wife, Daphne Colleen Pasquale, as personal representative of his estate, instituted a wrongful death action against the Power Companies and Pasquale Electric. The Power Companies filed cross-claims against Pasquale Electric based on an alleged written contract. The Power Companies also filed a third-party complaint against Pasquale Electric's insurance carrier, Travelers, seeking a declaration that the insurance policy issued to Pasquale Electric entitled the Power Companies to indemnification.

Thereafter, Travelers and Pasquale Electric filed cross-motions for summary judgment, alleging that Pasquale Electric did not assume liability for indemnification in its oral agreement of August 19, 1987, and that neither the June 26, 1987 contract nor the August 25, 1987 contract applied to the work done on August 19, 1987. The trial court agreed, and, in an order dated February 6, 1990, it dismissed the Power Companies' cross-claims against Pasquale Electric and the third-party complaint against Travelers. The Power Companies appeal.

## II.

The Power Companies' position is that the work on the short-circuited cable should be covered under either the Unit 5

contract, which was dated June 26, 1987, or the Unit 2 contract, which was dated August 25, 1987. With regard to the latter contract, the Power Companies point out that as a part of the scheduled maintenance under the Unit 2 contract, the cable in the boiler feed pump that short circuited would have been replaced.

Travelers and Pasquale Electric counter that there were several critical facts that were not disputed and support the trial court granting summary judgment in their favor. First, it was the Power Companies' admitted policy not to permit outside contractors to work unless they had a written contract. In each instance that Pasquale Electric was working on the Power Companies' premises, it was doing so under a written contract executed before the work was begun.

Second, Travelers and Pasquale Electric state that the emergency work cannot be placed under the June 26, 1987 contract for work done on Unit 5 because there was no attempt to comply with the terms of that contract. Under paragraph 39 of the contract, there can be no amendments for extra work unless in writing and signed by the parties.[1] The parties never discussed or executed such written amendments before or after the death of Michael Pasquale.

Third, with regard to the August 25, 1987 contract covering the scheduled maintenance of Unit 2, Travelers and Pasquale Electric point out that this contract was not signed by Pasquale Electric until a week after the death of Michael Pasquale. Moreover, they point to the Power Companies' established practice not to permit the contractor to start work on the premises until the contract is signed. Finally, they state that Pasquale Electric was not even notified that it had been awarded the work on Unit 2 until after Michael Pasquale's death on August 19, 1987.

III.

There is no disagreement that the Power Companies did not issue any work order for the emergency work on the short-circuited cable to Pasquale Electric. Instead, Pasquale Electric billed the Power Companies on August 22, 1987, for the work done in repairing the cable. The threshold question is whether the emergency work can be said to fall under either contract; if not, then there is no express indemnity agreement.

When we turn to the June 26, 1987 contract covering work on Unit 5, as previously indicated, it contains a provision for modification by the mutual consent of the parties. The Power Companies contend that the provision in the June 26 contract requiring any modification to be in writing and signed by the parties could be waived by an express oral agreement. They cite Syllabus Point 2 of *State ex rel. Coral Pools, Inc. v. Knapp,* 147 W.Va. 704, 131 S.E.2d 81 (1963):

> "A written contract may be altered or supplemented by a valid parol contract subsequently made."

*See also W.L. Thaxton Constr. Co. v. O.K. Constr. Co., Inc.,* 170 W.Va. 657, 295 S.E.2d 822 (1982); *John W. Lodge Dist. Co. v. Texaco, Inc.,* 161 W.Va. 603, 245 S.E.2d 157 (1978); *Wilkinson v. Searls,* 155 W.Va. 475, 184 S.E.2d 735 (1971); *Steinbrecher v. Jones,* 151 W.Va. 462, 153 S.E.2d 295 (1967). However, it does not appear that the contracts involved in the cited cases had express language which prohibited a modification unless in writing signed by the parties, as does the June 26, 1987 contract in this case.

Ordinarily, where a construction contract contains language to the effect that its terms cannot be changed without the written consent of the parties thereto,

---

**1.** Section 39 of the general conditions to the June 26, 1987 contract states:

"*ENTIRE AGREEMENT*

"The Contract of which these terms and conditions form a part constitutes the entire agreement between the parties and supersedes all previous and collateral agreements or understandings with respect to the subject matter thereof. No waiver, alteration, amendment, or modification of any of the provisions of the Contract shall be binding unless in writing and signed by the parties' duly authorized representatives."

then such written consent is required unless this condition is waived by the parties by their conduct or through circumstances that justify avoiding the requirement. *See, e.g., Acquisition Corp. of Am. v. American Cast Iron Pipe Co.,* 543 So.2d 878 (Fla.App.1989); *Consolidated Federal Corp. v. Cain,* 195 Ga.App. 671, 394 S.E.2d 605 (1990); *Central Iowa Grading, Inc. v. UDE Corp.,* 392 N.W.2d 857 (Iowa App. 1986); *Wehr Constructors, Inc. v. Steel Fabricators, Inc.,* 769 S.W.2d 51 (Ky.App. 1988); *Herbert & Brooner Constr. Co. v. Golden,* 499 S.W.2d 541 (Mo.App.1973); *McGaffick v. Leigland,* 130 Mont. 332, 303 P.2d 247 (1956); *Frantz v. Van Gunten,* 36 Ohio App.3d 96, 521 N.E.2d 506 (1987); *Menard & Co. Masonry Bldg. Contractors v. Marshall Bldg. Sys., Inc.,* 539 A.2d 523 (R.I.1988); *Eggers v. Luster,* 32 Wash.2d 86, 200 P.2d 520 (1948). *See generally* Annot., 2 A.L.R.3d 620 (1965).

It does not appear that we have had any occasion recently to address this rule. We mentioned it in *Vaughan Construction Co. v. Virginian Railway Co.,* 86 W.Va. 440, 451, 103 S.E. 293, 297 (1920), where we said:

"The contract expressly provided that changes, except such as the contract provided for, should not be made except by agreement in writing, and the contractors thereby bound themselves that under no consideration would they make any claim or demand for extra compensation or for additional work except it should be provided for in the manner stipulated in the contract. In our view of the evidence there is no just or reasonable basis for the plaintiff's claim of a modified contract. The terms of the original contract are against it; every act and conduct of the plaintiff during the progress of the work repels the theory of such modified contract, and the verdict of the jury based thereon was properly set aside."

We recognized the exception to this rule in *Simpson v. Mann,* 71 W.Va. 516, 76 S.E.

895 (1912). There, the owner had contracted to have a church constructed. The contract contained language that it could not be modified without the written consent of the parties. The owner authorized a change which the contractor followed, and this resulted in increased costs. The owner declined to pay, citing the contract language, and was sued by the contractor for the extra work. The trial court directed a verdict in favor of the owner, but we reversed, holding that whether there was a modification was an issue of fact, stating in the Syllabus:

"Though a written unsealed building contract provides that no alterations or additions shall be allowed or paid for unless the same and the cost thereof be agreed to in writing in advance, and no change or modification of the contract shall be recognized unless evidenced by agreement in writing, yet a modification may be made by oral contract between its parties."

In the present case, Louis Pasquale testified in his deposition that his company had never engaged in any major repairs for the Power Companies without a written contract being signed in advance of the work. He claimed that the emergency repairs that were performed on Unit 2 were major repairs. Louis Pasquale also admitted that it was customary for the Power Companies to authorize minor repairs that would then be invoiced and paid under an existing contract.

The Power Companies produced several invoices where this type of procedure had been followed. For instance, in May of 1986, Pasquale Electric's invoice showed that it worked on Unit 2 while working under a contract on Unit 3. The amount of this invoice was $4,706.40. Similarly, a Pasquale Electric invoice, dated July 26, 1986, showed work done on Unit 2 billed under a contract for Unit 5. This invoice was for $2,569.08. Finally, an invoice dated December 13, 1986, billed work done on Unit 2 under a contract for Unit 1.[2]

---

**2.** While these invoices are in the record, the applicable general contracts, under which this work was billed, are not.

The Pasquale Electric invoice dated August 22, 1987, which covered the emergency work done on Unit 2, also billed work done on Unit 5 under the June 26, 1987 contract. This invoice amounted to $4,534, but did not breakdown the amount charged for work done on each of the two units. The invoice was assigned a contract number of B–5973, which corresponded to the June 26, 1987 written contract number.

Louis Pasquale disclaimed any knowledge of the Power Companies' assignment of the contract number to these invoices. However, three invoices indicate that Pasquale Electric had, in fact, done additional work on another unit while under a repair contract for a different unit. Moreover, while Louis Pasquale testified that he believed the emergency work was major work requiring a formal contract, the amount of work done, as reflected by the August 1987 invoice, involved less money than the earlier invoices.

We conclude that there was a genuine issue of fact as to whether the nature of Pasquale Electric's past invoice practice with the Power Companies would bring the August 1987 emergency work within the June 26, 1987 written contract. In other words, there is some evidence that suggests that the parties may have had a course of conduct with regard to minor repairs that brought these repairs under an existing written contract.[3] If such a course of conduct existed, it would be possible for the parties to have waived the written modification requirement in the June 26, 1987 contract with regard to the emergency repairs.

■ This issue could not be decided as a matter of law by way of a summary judgment under our traditional law in this area as set out in Syllabus Points 3 and 5 of *Aetna Casualty and Surety Co. v. Federal Insurance Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963):

> "3. A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.

> \*   \*   \*   \*   \*   \*

> "5. The question to be decided on a motion for summary judgment is whether there is a genuine issue of fact and not how that issue should be determined."

*See also Goodwin v. Willard,* 185 W.Va. 321, 406 S.E.2d 752 (1991); *Beard v. Beckley Coal Mining Co.,* 183 W.Va. 485, 396 S.E.2d 447 (1990); *Truman v. Farmers & Merchants Bank,* 180 W.Va. 133, 375 S.E.2d 765 (1988).

A further question, which we do not address is, assuming that there is sufficient past conduct to be deemed a waiver of the written modification requirement, whether this fact alone would require the same result under indemnity principles. The parties do not address this point.[4]

For the foregoing reasons, the judgment of the Circuit Court of Mason County is reversed, and this case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

---

**3.** There is also some evidence from the prior invoices to suggest that the emergency repairs on Unit 2 were minor rather than major repairs, as claimed by Louis Pasquale.

**4.** In several express indemnity cases, the courts have addressed the question of whether the injury had a temporal, geographic, or causal relationship with the work to be performed under the contract containing the indemnity clause. *See, e.g., Southside Water Ass'n, Inc. v. Hargan,* 270 Ark. 117, 603 S.W.2d 466 (1980); *Poole v. Ocean Drilling & Exploration Co.,* 439 So.2d 510 (La.App.), *writ denied,* 443 So.2d 590 (La.1983); *Fossum v. Kraus–Anderson Constr. Co.,* 372 N.W.2d 415 (Minn.App.1985). The key question is whether the contract modification rule, which is basically designed to answer whether a party must be paid for the extra work done, is applicable to resolve the express contract indemnity language.