418 S.E.2d 738

**Daphne Colleen PASQUALE, Personal Representative of the Estate of Michael David Pasquale, Plaintiff Below, Appellee,**

v.

**OHIO POWER COMPANY, an Ohio Corporation, and Central Operating Company, a West Virginia Corporation, Defendants Below, Appellants,**

and

**Gallia Refrigeration, Inc., a/k/a Pasquale Electric Company, an Ohio Corporation, Defendant Below, Appellee.**

No. 20264.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 22, 1992.

Decided May 15, 1992.

Harvey D. Peyton, Calwell, McCormick & Peyton, L.C., Nitro, Ronald R. Morgan, II, Pt. Pleasant, Leo Catsonis, Charleston, for appellee Daphne Colleen Pasquale.

John M. Slack, III, Gale R. Lea, Jackson & Kelly, Charleston, for appellee Gallia Refrigeration, Inc., a/k/a Pasquale Elec. Co.

Timothy M. Miller, R. Clarke VanDervort, Robinson & McElwee, Charleston, for appellants Ohio Power Co. and Central Operating Co.

MILLER, Chief Justice:

Ohio Power Company, an Ohio corporation, and Central Operating Company, a West Virginia corporation (the Power Companies), appeal a final order of the Circuit Court of Mason County, dated November 8, 1990, denying their motion for a new trial and affirming a jury verdict in favor of the plaintiff, Daphne Pasquale. The plaintiff filed a wrongful death action against the Power Companies after her husband, Michael Pasquale, was killed while working for an independent contractor, Gallia Refrigeration, Inc. (Gallia), on the Power Companies' premises. The jury awarded the plaintiff approximately $6,175,000.

The principal errors raised by the defendant Power Companies are: (1) they did not breach their duty to Gallia and its employees to provide a reasonably safe place to work as a matter of law; (2) the trial court erred in dismissing their cross-claim against Gallia based on Gallia's defense of workers' compensation immunity because Gallia did not subscribe to the West Virginia's Workers' Compensation Fund; (3) plaintiff's counsel made improper remarks in closing argument; and (4) the trial court

erred in refusing to allow the Power Companies to introduce prior written contracts entered into by them and Gallia which outlined Gallia's safety responsibilities. Other errors include the trial court's refusal to instruct the jury on the independent contractor defense, the admission of a gruesome photograph depicting the decedent's body, and the calculation of prejudgment interest on the decedent's future wage loss. Except for this last assertion, which involves a correctable mathematical calculation, we find no error.

## I.

### FACTS

The Philip Sporn Plant is a coal-fired electric generating plant located in Mason County. It has five generating units, known as Units 1 through 5, which are separately owned by Appalachian Power Company and Ohio Power Company. The entire plant is managed by Central Operating Company.

Although the plant has an in-house maintenance staff, certain maintenance work is performed by independent contractors. One such contractor was Gallia, also known as Pasquale Electric Company, an Ohio corporation owned by Louis Pasquale. When Gallia was hired to perform maintenance work, the respective parties would ordinarily enter into a written contract whereby Gallia agreed to indemnify and hold the Power Companies harmless for any accidents that occurred while Gallia was performing maintenance work on plant premises. These contracts always required Gallia to maintain liability insurance.[1]

On June 26, 1987, the Power Companies and Gallia entered into a written contract under which Gallia was hired to do maintenance work on Unit 5. On or about August 18, 1987, while Gallia was performing the June 26, 1987 contract, a short circuit occurred in an electrical cable that was connected to a boiler feed pump located in Unit No. 2. The Power Companies needed

to have this short circuit repaired immediately.

The short-circuited cable carried 2300 volts of electricity and was connected to a boiler feed pump at one end and to a motor control center at the other. These two pieces of equipment were located on the basement level of the plant. The cable, which was approximately 350 feet in length, descended through the concrete floor into a condenser pit. In the condenser pit, the cable, along with other high-voltage cables, was placed on trays that were suspended above the floor of the pit. There is an opening in the basement floor through which the condenser pit is visible.

In preparation for the emergency repair, the Power Companies disconnected both ends of the short-circuited cable and placed red tags on each end to identify that it was de-energized. The plaintiff's evidence showed that someone standing in the condenser pit could not possibly see the tags. Moreover, the pit was not well-lighted, and there were no marks on the individual cables which identified them.

Around 8:30 a.m. on August 19, 1987, the plant's electrical supervisor, Mr. Hysell, asked Gallia's foreman, Mr. Neal, to repair the defective cable. Initially, Mr. Neal went to the blueprint room and looked at a copy of the wiring diagram for Unit No. 2, but was not allowed to take a copy with him. Mr. Hysell and Mr. Neal both testified that Mr. Hysell escorted Mr. Neal to the basement of Unit No. 2 to show him the cable, but Mr. Hysell did not go into the condenser pit to survey the work.

Mr. Neal testified that he took the decedent into the condenser pit and pointed out the de-energized cable. They then returned to the basement and waited for Mr. Cogar, another Gallia employee, who was supposed to bring some equipment to use on the job. Mr. Neal left before Mr. Cogar returned. Mr. Cogar testified that when he returned, the decedent told him that he knew which cable to cut. They both climbed into the pit and onto the cable tray.

1. In *Pasquale v. Ohio Power Co.,* 186 W.Va. 501, 413 S.E.2d 156 (1991), we reversed the trial court's ruling dismissing the Power Companies' third-party claims against Gallia and its liability insurance carriers based on contractual indemnity.

At that point, the decedent cut into a live cable and was electrocuted.

The plaintiff's engineering expert testified about several violations of the National Electrical Code by the Power Companies, in particular their failure to adequately identify the de-energized cable. This evidence supported one of the plaintiff's main theories. Several years before this accident, the Power Companies advised Gallia that it could no longer de-energize and tag cables at the plant because of an incident in which Gallia had unduly delayed placing a de-energized cable back into service.[2] The plaintiff's expert also testified about safety precautions that should have been taken at the job site, such as using rubber insulation mats, gloves, and boots to avoid electrical grounding.[3]

There was considerable testimony for both parties about the lack of safety equipment. The plaintiff's evidence was that the Power Companies were aware that Gallia did not have the necessary safety equipment to perform the emergency work. The Power Companies countered that Gallia should have provided safety equipment for its own employees, but if it needed any, that it could have borrowed the equipment from the Power Companies. The defendant's engineering expert placed the entire responsibility for the accident on Gallia and the decedent. He maintained that under the National Electrical Code, Gallia had the duty to provide safety equipment, to properly identify the de-energized cable, and to supervise its employees.[4]

Following a two-day trial, the jury returned a $6,174,712 verdict in favor of the plaintiff. The jury found Michael Pasquale 0 percent negligent, Gallia 85 percent negligent, and the Power Companies 15 percent negligent. In an order dated November 8, 1990, the trial court denied the Power Companies' post-trial motions.

## II.

### DISMISSAL OF CROSS–CLAIM AGAINST GALLIA

Initially, we address the Power Companies' claim that the court erred in dismissing its cross-claim against Gallia. On August 13, 1990, shortly before the trial started, the Power Companies' cross-claim against Gallia was dismissed. The Power Companies sought common law contribution from Gallia based on the theory that Gallia's negligence caused or contributed to its own employee's death. The Power Companies contend that because Gallia did not subscribe to the West Virginia Work-

---

**2.** Under the plant's safety procedure, once a cable is tagged, the employee who signed the tag is the only one who can remove it from the piece of equipment. No one from Gallia could be found to remove the tag.

**3.** The expert testified that electricity would not seriously injure an individual who is properly insulated.

**4.** At trial, the defendant's engineering expert testified as follows:

"Q Now, can you compare what Pasquale Electric Company's conduct was in this case to the sections of the National Electrical Safety Code and state your opinion as to the propriety of that company's conduct and its employees?

"A Pasquale Electric Company apparently failed to train their employees satisfactory [*sic*] to recognize hazards. They did not equip their employees in this particular case with protective equipment, such as rubber gloves or other kinds of gloves, glasses, goggles. They did not provide the work place in a satisfactory condition in that they did not provide ladders and sufficient means of access. They allowed a man to proceed with work without the qualifying person, their authoritative supervisor on the spot. The man, actually the employee of Pasquale Electric Company, cut into a cable before they actually tested it or made any means of actively determining that the cable was indeed the cable that they were supposed to cut. Mr. Pasquale and Mr. Cogar both failed to regard as energized a cable which they had not specifically determined to be de-energized. They performed no testing. Mr. Loren Neal did some testing and claims that he properly, that he identified a cable. He put no means of, no marks on the cable, which could be referred to back again. So, that when Mr. Pasquale went there, he made a mistake and went to the wrong cable. I've gone through quite a number of them.

"Q Does the National Electrical Safety Code provide that Pasquale Electric Company should have tagged that or marked the line in the condenser pit for its employees?

"A In the sense that tagging means identify in that case, yes."

ers' Compensation Fund, the Power Companies should not have been precluded from obtaining contribution from Gallia as a joint tortfeasor.[5]

At the time of the accident, Gallia was a small family-owned company. It specialized in the air conditioning, heating, refrigeration, and electrical business. Gallia's office and shop were located in Ohio, and all hiring went through its office in Gallipolis, Ohio. The company subscribed to the Ohio workers' compensation system, and on August 19, 1987, it was paying a premium to the Ohio Workers' Compensation Fund to cover the decedent.

The decedent was an Ohio resident. Although he had worked for Gallia on an intermittent basis in the past, he had never been regularly employed by the company. On August 10, 1987, Louis Pasquale hired the decedent, his nephew, and explained to him that the work would be temporary. The decedent worked at the Sporn plant from August 10, 1987, until the date of his death nine days later.

After her husband's death, the plaintiff applied for and received an award from the Ohio Workers' Compensation Fund for herself and the couple's two minor children. The plaintiff never applied for workers' compensation benefits in West Virginia.

The Power Companies argue that their cross-claim should not have been dismissed because Gallia was not covered by the West Virginia workers' compensation system. Because the work was performed in West Virginia, the Power Companies contend that it was mandatory for Gallia to have West Virginia workers' compensation coverage in order to claim immunity and avoid being sued as a joint tortfeasor for contribution. The trial court held, as a matter of law, that under principles of comity, Gallia was entitled to immunity under the Ohio Workers' Compensation Act and that the Power Companies' cross-claim in West Virginia was barred.

The Power Companies primarily rely on *Jenkins v. Sal Chemical Co.*, 167 W.Va. 616, 280 S.E.2d 243 (1981), and *Van Camp v. Olen Burrage Trucking, Inc.*, 184 W.Va. 567, 401 S.E.2d 913 (1991). Neither of these cases was decided on the doctrine of comity. *Jenkins* involved an Ohio corporation that operated a plant in West Virginia and had its employees sign an agreement to be bound by Ohio's Workmen's Compensation Act. We held that the company could not avoid our workers' compensation law in this fashion. In *Van Camp*, we answered a certified question that addressed solely the type of activities that would subject an employer to our Workers' Compensation Act.[6]

■ Initially, we note that the Full Faith and Credit Clause of the United States

---

5. An issue not raised by the parties is whether a defendant has standing to assert error in the trial court's dismissal of a codefendant against whom the defendant is asserting a claim for contribution or indemnity when appealing a plaintiff's verdict. It appears to be generally recognized that such error may be appealed. *See, e.g., Land v. Highway Constr. Co.*, 64 Haw. 545, 645 P.2d 295 (1982); *Stone v. Williams*, 64 N.Y.2d 639, 485 N.Y.S.2d 42, 474 N.E.2d 250 (1984); *Cole v. Arnold*, 545 S.W.2d 95 (Tenn. 1977).

In a different context, we recognized a third-party defendant's right to contest the third-party plaintiff's liability when it directly affects him. *See Southern Erectors, Inc. v. Olga Coal Co.*, 159 W.Va. 385, 223 S.E.2d 46 (1976). Because we find no merit in the Power Companies' cross-claim, we will not discuss its hypothetical effect on the plaintiff's verdict.

6. The Syllabus of *Van Camp* stated:

"The following factors are dispositive of the issue of whether an employer must subscribe to the West Virginia Workers' Compensation Fund pursuant to W.Va.Code § 23–2–1 (Supp. 1990): (1) whether the employer obtained authorization to do business in West Virginia; (2) whether the employer operates a business or plant or maintains an office in West Virginia; (3) whether the injured employee was hired in West Virginia; (4) whether the employer regularly hires other West Virginia residents to work at a West Virginia facility or office; and (5) whether the employee in question worked on a regular basis at a West Virginia facility for the employer prior to the injury at issue. If the answer to each of the above questions is negative, then the employer is not required to subscribe to the West Virginia Workers' Compensation Fund as he cannot be said to regularly employ a person for the purpose of operating 'any form of industry, service or business in this state' within the meaning of W.Va.Code § 23–2–1."

Constitution[7] does not require us to recognize the exclusivity of the Ohio workers' compensation law.[8] This principle of law was made clear in *Carroll v. Lanza,* 349 U.S. 408, 75 S.Ct. 804, 99 L.Ed. 1183 (1955), where the Supreme Court held that the State of Arkansas was not required to give full faith and credit to a Missouri workers' compensation statute which had been construed to provide the injured employee's exclusive remedy. In *Carroll,* the employee of a subcontractor was injured while working in Arkansas. The subcontractor had Missouri workers' compensation coverage, and the employee collected benefits thereunder. The employee also sued the general contractor in Arkansas.

The court in *Carroll* recognized that the Missouri Supreme Court had construed its compensation statute to provide the general contractor immunity from suit because the subcontractor had workers' compensation coverage. However, under Arkansas law, immunity was provided for the employer, but not for third parties. The Supreme Court found:

> "Missouri can make her Compensation Act exclusive, if she chooses, and enforce it as she pleases within her borders. Once that policy is extended into other States, different considerations come into play. Arkansas can adopt Missouri's policy if she likes. Or, as the *Pacific Employers Insurance Co.* [*v. Industrial Accident Commission of California,* 306

U.S. 493, 59 S.Ct. 629, 83 L.Ed. 940 (1939)] case teaches, she may supplement it or displace it with another, insofar as remedies for acts occurring within her boundaries are concerned. Were it otherwise, the State where the injury occurred would be powerless to provide any remedies or safeguards to nonresident employees working within its borders. We do not think the Full Faith and Credit Clause demands that subserviency from the State of the injury." 349 U.S. at 413–14, 75 S.Ct. at 807–08, 99 L.Ed. at 1189.

What is involved here, as the trial court correctly discerned, was whether we would recognize the doctrine of comity and bar the Power Companies' cross-claim for contribution against Gallia because Gallia had coverage under the Ohio's Workers' Compensation Act. Comity is a court-created doctrine through which the forum court may give the laws or similar rights accorded by another state effect in the litigation in the forum state. Comity is a flexible doctrine and rests on several principles. One is legal harmony and uniformity among the co-equal states. A second, grounded on essential fairness, is that the rights and expectations of a party who has relied on foreign law should be honored by the forum state. Finally, and perhaps most important, the forum court must ask itself whether these rights are compatible with its own laws and public policy.[9] *See*

---

**7.** The Full Faith and Credit Clause found in Article IV, Section 1 of the United States Constitution provides: "Full Faith and Credit shall be given in each State to the public Acts, Records and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."

**8.** In Syllabus Point 1 of *Johnson v. Huntington Moving & Storage, Inc.,* 160 W.Va. 796, 239 S.E.2d 128 (1977), we recognized the Full Faith and Credit Clause's requirement that we must honor judgments from a court of record of other states, unless such court was without jurisdiction. As the language in the Full Faith and Credit Clause indicates, it also relates to public acts and records of another state. In *Sun Oil Co. v. Wortman,* 486 U.S. 717, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988), the Supreme Court de-

fined the extent of the Full Faith and Credit Clause's applicability to public acts and records.

**9.** Our discussion of comity and its elements has been limited. In *Campen Brothers v. Stewart,* 106 W.Va. 247, 145 S.E. 381 (1928), we refused to enforce the requirement for attorney's fees in a Virginia promissory note sought to be enforced in this state. We stated: "[N]o state or nation is bound to recognize or enforce any contracts which are in variance with the law or public policy of such state. In such a situation, the doctrine of comity must yield to the law of the forum." 106 W.Va. at 249–50, 145 S.E. at 382. (Citations omitted). We spoke to the doctrine of international comity in *Gebr. Eickhoff Maschinenfabrik Und Eisengieberei mbH v. Starcher,* 174 W.Va. 618, 629, 328 S.E.2d 492, 505 (1985), *quoting Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 937 (D.C.Cir.1984): " ' "Comity" summarizes ... the

*generally* 16 Am.Jur.2d *Conflicts of Law* § 11 (1979 & Supp.1992).

In this case, we deal with an Ohio workers' compensation statute. Like us, Ohio recognizes that workers' compensation is totally a statutory creature.[10] Under Section 4123.74 of the Ohio Code, an employer who has workers' compensation coverage "shall not be liable to respond in damages at common law or by statute for any injury or occupational disease, or bodily condition, received or contracted by an employee in the course of or arising out of his employment, or for any death resulting from such injury[.]" [11]

Ohio courts have construed this provision to mean that an employer whose employee is covered by workers' compensation cannot be sued by a third party for claims of contribution or implied indemnity arising from the employee's accident. *McPherson v. Cleveland Punch & Shear Co.*, 816 F.2d 249 (6th Cir.1987) (construing Ohio law). *See Bankers Indem. Ins. Co. v. Cleveland Hardware & Forging Co.*, 77 Ohio App. 121, 62 N.E.2d 180, *appeal dismissed,* 145 Ohio St. 615, 62 N.E.2d 251 (1945).

We interpreted W.Va.Code, 23–2–6 (1974),[12] a similar provision in our workers' compensation statute, in *Sydenstricker v. Unipunch Products, Inc.*, 169 W.Va. 440, 288 S.E.2d 511 (1982). We held in Syllabus Point 6:

"Where the right of contribution is initially grounded in common liability in tort, courts have held that a joint tortfeasor employer is immune from a third-party contribution suit because he is initially immune from tort liability to his injured employee by virtue of the workmen's compensation statutory bar of such tort actions."

We also found in *Sydenstricker* that a claim of implied indemnity could not be brought where the third party was at fault to any degree. Here, the jury assessed the Power Companies 15 percent negligent.

Thus, our statute and case law is comparable to Ohio's law. Moreover, under W.Va.Code, 23–2–1c (1975), the legislature has required deference be given to a foreign state's compensation law under certain conditions. This statute makes the compensation law of another state the exclusive remedy against the employer for a

---

degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum.' "

**10.** *See Westenberger v. Industrial Comm'n,* 135 Ohio St. 211, 20 N.E.2d 252 (1939) (workers' compensation controlled by statute and not by common law); Syllabus Point 1, *Clark v. State Workmen's Compensation Comm'r,* 155 W.Va. 726, 187 S.E.2d 213 (1972) (the right to workers' compensation benefits is created wholly by statute).

**11.** The full text of Section 4123.74 (1991) of the Ohio Revised Code is:

"Employers who comply with section 4123.35 of the Revised Code shall not be liable to respond in damages at common law or by statute for any injury, or occupational disease, or bodily condition, received or contracted by any employee in the course of or arising out of his employment, or for any death resulting from such injury, occupational disease, or bodily condition occurring during the period covered by such premium so paid into the state insurance fund, or during the interval of time in which such employer is permitted to pay such compensation directly to his injured employees or the dependents of his killed employees, whether or not such injury, occu-

pational disease, bodily condition, or death is compensable under sections 4123.01 to 4123.-94, inclusive, of the Revised Code."

Ohio has recognized that employees may sue their employers for intentional tortious conduct. *See Blankenship v. Cincinnati Milacron Chem., Inc.,* 69 Ohio St.2d 608, 433 N.E.2d 572, *cert. denied,* 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 110 (1982). *See also* W.Va.Code, 23–4–2 (1991).

**12.** W.Va.Code, 23–2–6, provides in pertinent part:

"Any employer subject to this chapter who shall subscribe and pay into the workmen's compensation fund the premiums provided by this chapter or who shall elect to make direct payments of compensation as herein provided, shall not be liable to respond in damages at common law or by statute for the injury or death of any employee, however occurring, after so subscribing or electing, and during any period in which such employer shall not be in default in the payment of such premiums or direct payments and shall have complied fully with all other provisions of this chapter."

In 1991, this provision was amended to substitute the phrase "workers' compensation" for "workmen's compensation" throughout the section. 1991 W.Va. Acts, ch. 16.

nonresident employee who is temporarily employed in this state, if such employee is injured in this state and is covered by his or her employer's workers' compensation in the other state.[13] Ohio has a parallel provision, Section 4123.54,[14] in its workers' compensation statute. The evidence is not disputed that the decedent was only temporarily employed in this state.

These statutory provisions express a similar legislative policy that we must consider in determining the comity issue. The same statutory policies govern in each state. First, a covered employer is protected against third-party claims for contribution and implied indemnity in both states. Second, the statutes of both states allow the compensation law of the foreign state to be the exclusive remedy where a nonresident employee is temporarily working in the forum state and has workers' compensation coverage in the foreign state.[15]

Thus, we conclude that under the principles of comity, Gallia, an Ohio corporation not covered by West Virginia workers' compensation law, but covered by Ohio

workers' compensation law, temporarily employing an Ohio resident in West Virginia who is injured here, is immune from a suit for contribution by a joint tortfeasor.

## III.

## INDEPENDENT CONTRACTOR DOCTRINE

The Power Companies' principal assignment of error on the liability issue is that because Gallia was an independent contractor, they should not be liable for the death of one of Gallia's employees. We have recognized that "the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servant." *Peneschi v. National Steel Corp.,* 170 W.Va. 511, 521, 295 S.E.2d 1, 11 (1982), *quoting Restatement (Second) of Torts* § 409 (1976). *See Sanders v. Georgia–Pacific Corp.,* 159 W.Va. 621, 225 S.E.2d 218 (1976); *Carrico v. West Virginia Cent. & P. Ry. Co.,* 39 W.Va. 86, 19 S.E. 571 (1894).[16]

**13.** The applicable provisions of W.Va.Code, 23–2–1c, are:

> *"If the employee is a resident of a state other than this State and is subject to the terms and provisions of the workmen's compensation law or similar laws of a state other than this State,* such employee and his dependents shall not be entitled to the benefits payable under this chapter on account of injury, disease or death in the course of and *as a result of employment temporarily within this State, and the rights of such employee and his dependents under the laws of such other state shall be the exclusive remedy against the employer on account of such injury, disease or death."* (Emphasis added).

In 1991, this provision was also amended to substitute the phrase "workers' compensation" for "workmen's compensation." 1991 W.Va. Acts, ch. 174.

**14.** The relevant portion of Section 4123.54 (1991) of the Ohio Revised Code is:

> "If any employee is a resident of a state other than this state and is insured under the workers' compensation law or similar laws of a state other than this state, such employee and his dependents are not entitled to receive compensation or benefits under section 4123.01 to 4123.94 of the Revised Code, on account of injury, disease, or death arising out of or in the course of employment while temporarily within this state and the rights of such employee and his dependents under the

laws of such other state shall be the exclusive remedy against the employer on account of such injury, disease, or death."

**15.** While we have used the comity doctrine to resolve this question, other courts have applied a conflict of law approach. *See Kelly v. Guyon Gen. Piping, Inc.,* 882 F.2d 108 (4th Cir.1989) (Virginia law versus South Carolina law); *Eger v. E.I. Du Pont DeNemours & Co.,* 110 N.J. 133, 539 A.2d 1213 (1988) (referring to Section 184 of the *Restatement (Second) of Conflicts of Law* (1971)). *See generally* 4 *Larson's Workers' Compensation Law* § 88.13 (1990). We believe there is more flexibility under comity principles. Some courts have engrafted onto their conflict of law rule a provision that the forum state's public policy and interest are of paramount importance. *See, e.g., Braxton v. Anco Elec., Inc.,* 100 N.C.App. 635, 397 S.E.2d 640 (1990), *aff'd,* 330 N.C. 124, 409 S.E.2d 914 (1991); *Reid v. Hansen,* 440 N.W.2d 598 (Iowa 1989).

**16.** When asserting the independent contractor defense, the employer must first establish that an independent contractor relationship exists. In *Sanders v. Georgia–Pacific Corp.,* 159 W.Va. at 628, 225 S.E.2d at 222, we said: "The only general test of the existence of the relationship is whether the one claiming the existence of the independent contractor relationship either controls or has the right to control the work." In

However, we have acknowledged that the independent contractor defense is riddled with numerous exceptions that limit its applicability. Indeed, Section 409 of the *Restatement (Second) of Torts* (1978) begins its statement of the independent contractor defense with the warning "[e]xcept as stated in §§ 410–429."[17] Both *Peneschi* and *Sanders* refer to the statement in *Pacific Fire Insurance Co. v. Kenney Boiler & Manufacturing Co.*, 201 Minn. 500, 503, 277 N.W. 226, 228 (1937), that the independent contractor defense rule "is now primarily important as a preamble to the catalog of its exceptions." *See Peneschi v. National Steel Corp.*, 170 W.Va. at 521, 295 S.E.2d at 11; *Sanders v. Georgia-Pacific Corp.*, 159 W.Va. at 626, 225 S.E.2d at 221.

▪ The Power Companies argue that we recognized the dangerous work exception to the independent contractor defense rule in *Peneschi*.[18] Specifically, we stated

that "we are unwilling to apply this rule to employees of independent contractors where the contractor was expressly hired to work with or around an abnormally dangerous condition." 170 W.Va. at 522, 295 S.E.2d at 12.

This language from *Peneschi*, which was followed by no citations, may be accurate. There are courts that have recognized that the inherently dangerous work exception is designed to protect third parties other than the employees of the independent contractor hired to do the dangerous work. These courts, in effect, read the term "others" in Section 416 and Section 427 of the *Restatement* to exclude employees of the independent contractor.[19] Other courts have reached the opposite conclusion and have held that the employee of an independent contractor doing dangerous work under contract with the owner-employer may sue the latter for injuries arising from the dangerous work.[20]

*Paxton v. Crabtree*, 184 W.Va. 237, 244, 400 S.E.2d 245, 252 (1990), we gave a more detailed definition, quoting *Naccash v. Burger*, 223 Va. 406, 418–19, 290 S.E.2d 825, 832 (1982):

"'Four factors enter into determination of the question whether a master-servant relationship exists within the contemplation of the doctrine of respondeat superior, (1) selection and engagement of the servant, (2) payment of compensation, (3) power of dismissal, and (4) power of control. The first three factors are not essential to the existence of the relationship; the fourth, the power of control, is determinative.'"

**17.** Section 409 of the *Restatement (Second) of Torts* reads: "Except as stated in §§ 410–429, the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants."

**18.** The dangerous work exception to the independent contractor defense is that if the employer of the independent contractor knows the work is hazardous or dangerous, he cannot escape liability. This exception is outlined in Sections 416 and 427 of the *Restatement (Second) of Torts* (1978):

Section 416: "One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precau-

tions, even though the employer has provided for such precautions in the contract or otherwise."

Section 427: "One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger."

**19.** *See, e.g., Ray v. Schneider*, 16 Conn.App. 660, 548 A.2d 461, *cert. denied*, 209 Conn. 822, 551 A.2d 756 (1988); *Vertentes v. Barletta Co.*, 392 Mass. 165, 466 N.E.2d 500 (1984); *Rowley v. Mayor & City Council of Baltimore*, 305 Md. 456, 505 A.2d 494 (1986); *Conover v. Northern States Power Co.*, 313 N.W.2d 397 (Minn.1981); *Whitaker v. Norman*, 75 N.Y.2d 779, 552 N.Y.S.2d 86, 551 N.E.2d 579 (1989); *Tauscher v. Puget Sound Power & Light Co.*, 96 Wash.2d 274, 635 P.2d 426 (1981); *Wagner v. Continental Casualty Co.*, 143 Wis.2d 379, 421 N.W.2d 835 (1988); *Jones v. Chevron U.S.A., Inc.*, 718 P.2d 890 (Wyo.1986).

**20.** *See, e.g., Lindler v. District of Columbia*, 502 F.2d 495 (D.C.Cir.1974); *Van Arsdale v. Hollinger*, 68 Cal.2d 245, 66 Cal.Rptr. 20, 437 P.2d 508 (1968); *Giarratano v. Weitz Co.*, 259 Iowa 1292, 147 N.W.2d 824 (1967); *Ballinger v. Gascosage Elec. Co-op.*, 788 S.W.2d 506 (Mo.1990); *Vannoy v. City of Warren*, 15 Mich.App. 158, 166 N.W.2d 486 (1968); *International Harvester Co. v. Sartain*, 32 Tenn.App. 425, 222 S.W.2d 854 (1948).

For purposes of this case, we need not decide this issue. We do observe that *Peneschi*'s statement is dictum and fails to recognize that there may be other exceptions that will subject an employer to potential liability for injuries to the employees of an independent contractor. Even those jurisdictions that adhere to nonliability for injuries to employees of independent contractors engaged in dangerous work recognize that the employer of the independent contractor may be held liable on other grounds. For example, the Court of Appeals of Maryland in *Rowley v. Mayor & City Council of Baltimore*, 305 Md. 456, 475, 505 A.2d 494, 503–04 (1986), gave this summary of the duty owed to an employee of an independent contractor:

"An employee of an independent contractor injured on the employer's premises by reason of a latent defect (known to the employer but not to the contractor or his employee) which existed when the work began has recourse against the employer.... Similarly, the employee of an independent contractor invited to cross land of the employer to reach a workplace thereon may recover from the employer for injuries resulting from a defective condition of the premises within the employer's control, and not within the duties of the contractor to repair. Nor does our decision today affect the possible liability of an employer who by his agreement with the contractor retains significant control over, and responsibility for, the safety of the workplace." (Citations omitted).

*See also Conover v. Northern States Power Co.*, 313 N.W.2d 397 (Minn.1981); *Whitaker v. Norman*, 75 N.Y.2d 779, 552 N.Y.S.2d 86, 551 N.E.2d 579 (1989); *Beary v. Container Gen. Corp.*, 368 Pa.Super. 61, 533 A.2d 716 (1987), *appeal denied*, 520 Pa. 586, 551 A.2d 213 (1988); *Colloi v. Philadelphia Elec. Co.*, 332 Pa.Super. 284, 481 A.2d 616 (1984); *Hutchison v. Teeter*, 687 S.W.2d 286 (Tenn.1985); *Tauscher v. Puget Sound Power & Light Co.*, 96 Wash.2d 274, 635 P.2d 426 (1981); *Jones v. Chevron U.S.A., Inc.*, 718 P.2d 890 (Wyo.1986).

■ We recognized many of these exceptions in Syllabus Point 1 of *Sanders v. Georgia–Pacific Corp.*:

"One who would defend against tort liability by contending that the injuries were inflicted by an independent contractor has the burden of establishing that he neither controlled nor had the right to control the work, and if there is a conflict in the evidence and there is sufficient evidence to support a finding of the jury, the determination of whether an independent contractor relationship existed is a question for jury determination."

■ Moreover, in Syllabus Point 2 of *Sanders*, we recognized the general rule that the occupier of premises employing an independent contractor has the duty of providing a reasonably safe place to work, which includes the concomitant duty to disclose latent defects:

"The owner or occupier of premises owes to an invitee such as a non-employee workman or an independent contractor the duty of providing him with a reasonably safe place in which to work and has the further duty to exercise ordinary care for the safety of such persons."

*Sanders* is also noteworthy because in Syllabus Point 3,[21] we expressly rejected Syllabus Point 2 of *Chenoweth v. Settle Engineers, Inc.*, 151 W.Va. 830, 156 S.E.2d 297 (1967). *Chenoweth* engrafted an exception onto the general rule that an employer of an independent contractor has a duty to provide a safe place to work. The exception was that an employer was not liable "where the conditions of the place of

---

21. Syllabus Point 3 of *Sanders* states:

"Syllabus No. 2, *Chenoweth v. Settle Engineers*, 151 W.Va. 830, 156 S.E.2d 297 (1967), is here specifically disapproved and will not be applied even though the conditions of the place of work are constantly changing as the work progresses except in those rare and unusual instances where it can be shown that the one asserting the defense of independent contractor neither knew nor in the exercise of reasonable care, skill and diligence should have known of such changing conditions."

work are constantly changing." Syllabus Point 2, in part, *Chenoweth, supra.*[22]

Thus, even though an employer who hires an independent contractor to engage in dangerous work may not be liable to the employees of the independent contractor injured while performing the dangerous work, the employer may be liable on other grounds. An employer owes a duty to provide a reasonably safe place to work to employees of independent contractors who are on the premises.[23] This duty includes the duty to warn of latent defects existing before the work is started that are known to the employer, but are not readily observable by the employee. The employer of an independent contractor will also be liable to such contractor's employee if he retains some control or supervision over the work which negligently injures the employee. Finally, the employer is liable for an injury to an employee of an independent contractor caused by the negligence of the employer.

The Washington court in *Winfrey v. Rocket Research Co.*, 58 Wash.App. 722, 794 P.2d 1300, *review denied,* 115 Wash.2d 1030, 803 P.2d 324 (1990), dealt with a factual situation analogous to the present case. The plaintiff was a journeyman electrician who worked for Linder Electric. Linder had been hired to install a 110–volt system in Rocket Research's laboratory. While the plaintiff was working, he was asked by an employee of Rocket Research to find the part numbers on some low voltage fuses located in a high voltage cabinet in the electrical power room. This task was unrelated to the project involving the 110–volt system. Although the plaintiff had been in the power room before, he was not aware that it contained devices handling more than 480 volts of electricity. While the plaintiff was attempting to read the part numbers off of the low voltage fuses, his arm came in contact with a 12,500 volt fuse, and he sustained serious injuries.

The court, in affirming the jury verdict for the plaintiff, quoted this statement from *Lamborn v. Phillips Pacific Chemical Co.*, 89 Wash.2d 701, 707, 575 P.2d 215, 220 (1978), *citing Epperly v. City of Seattle*, 65 Wash.2d 777, 785, 399 P.2d 591, 597 (1965): " 'The owner of a premises owes to the servant of an independent contractor, employed to perform work on that owner's premises, the duty to avoid endangering him by the owner's own negligence.' " 58 Wash.App. at 724, 794 P.2d at 1302. The court in *Winfrey* then came to this specific conclusion: "Under this theory, the landowner must keep the premises reasonably safe and warn of dangers which are not readily apparent but are known to or discoverable by the owner with the exercise of reasonable care." 58 Wash.App. at 724, 794 P.2d at 1302. (Citations omitted). The court found that Rocket Research had failed to properly label the high voltage fuses and related electrical equipment contained in its power cabinet.

In this case, there is evidence that the Power Companies were negligent in failing to provide a reasonably safe place to work on the short-circuited cable. The plaintiff's evidence was that the Power Companies placed the red tags too far from the actual place where the work was to be performed. Moreover, the plaintiff presented evidence that the Power Companies were negligent when they did not take Gallia's foreman into the pit area and point out the actual de-energized cable. Finally,

---

**22.** The complete text of Syllabus Point 2 of *Chenoweth* is: "The rule that an employer of an independent contractor has a duty to provide a safe place in which to work on the premises of such employer is subject to an exception where the conditions of the place of work are constantly changing." In *Chenoweth*, the City of Elkins had a right under its contract with a sewer contractor to inspect and approve the work. A ditch collapsed killing three of the contractor's employees. The City successfully maintained that its control of the work should not extend to a situation where the work site changed on a daily basis.

**23.** The employer is not liable for defects on the premises that were created by contractors over whom he has no control. *See, e.g., Okleshen v. Rune & Sons, Inc.*, 117 Ill.App.2d 244, 254 N.E.2d 554 (1969); *Mentzer v. Ognibene,* 408 Pa.Super. 578, 597 A.2d 604 (1991); *Chevron U.S.A., Inc. v. Lara,* 786 S.W.2d 48 (Tex.App. 1990).

Mr. Neal stated that the Power Companies refused to allow him to take the prints of the cable layout out of the print room. If he had had the wiring diagram with him in the condenser pit, Mr. Neal could have accurately located the involved cable. We find this evidence sufficient to allow the jury to consider whether the Power Companies' negligence contributed to the decedent's death, particularly when we view it under our traditional rule that power companies owe a high degree of care with regard to electricity. *See Helmick v. Potomac Edison Co.*, 185 W.Va. 269, 406 S.E.2d 700, *cert. denied*, —— U.S. ——, 112 S.Ct. 301, 116 L.Ed.2d 244 (1991); *Miller v. Monongahela Power Co.*, 184 W.Va. 663, 403 S.E.2d 406, *cert. denied*, —— U.S. ——, 112 S.Ct. 186, 116 L.Ed.2d 147 (1991).[24]

## IV.

### GRUESOME PHOTOGRAPHS

■ The plaintiff introduced one photograph depicting the decedent in the cable tray after he had been electrocuted. The Power Companies contend that the photograph was gruesome and was inadmissible because it had no evidentiary value. The plaintiff's asserted reason for admitting the photograph was to show the nature of the workplace. The plaintiff's expert testified about the inadequate safety precautions discernible from the photograph. We find the photograph was relevant.

■ The only remaining question is whether it was more prejudicial than relevant so that under the balancing test of

Rule 403 of the West Virginia Rules of Evidence,[25] it should not have been admitted. We begin with the determination of whether the photograph is, in fact, gruesome. As we stated in Syllabus Point 6 of *State v. Buck*, 170 W.Va. 428, 294 S.E.2d 281 (1982):

> "In order for photographs to come within our gruesome photograph rule established in *State v. Rowe*, [163 W.Va. 593], 259 S.E.2d 26 (1979), there must be an initial finding that they are gruesome."

*See State v. Mullins*, 171 W.Va. 542, 301 S.E.2d 173 (1982).

After viewing the photograph, we do not find it gruesome. The photograph depicts the back of the decedent. While part of his shirt has been torn off, there is no blood or gruesome wound pictured that would inflame the average juror. Moreover, the photograph was not exhibited or referred to in the plaintiff's closing argument.

## V.

### EVIDENCE OF CUSTOM AND USAGE

■ The Power Companies further assert that the trial court erred in refusing to admit into evidence the written contract they entered into with Gallia, dated June 26, 1987. Under its General Conditions, the contract contained a section relating to "SAFETY MEASURES." This section outlined a series of safety obligations placed on Gallia. The trial court ruled that these safety obligations did not apply to the Au-

---

**24.** The Power Companies also complain about the trial court's refusal to give three of their instructions. Instruction Nos. 1 and 2 centered on the landowner's lack of any duty to warn of an open and obvious danger. However, there was sufficient evidence that the lack of appropriate labeling of the disconnected cable contributed to the accident. Without adequate labeling, the dangerous condition was not open and apparent because there was no way to identify the de-energized cable from the adjoining live ones. Instruction No. 4 would have absolved the Power Companies from liability if the jury found that they could not have anticipated that the decedent would cut into a live electrical cable. This instruction ignores the Power Companies' failure to adequately identify the cable.

There were other correct instructions given by the trial court regarding the Power Companies' duty, their lack of responsibility for Gallia's negligence, and the contributory negligence of the decedent. We find no instructional error.

**25.** Rule 403 of the Rules of Evidence provides:

> "**Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

gust 19, 1987 emergency work because that work was not covered under the June 26, 1987 contract.

■ We find that the trial court's ruling was correct. The Power Companies supply no authority for their position. Essentially, they attempt to argue that the June 26, 1987 contract outlined the customs and usages of the trade and that these detailed safety standards should apply to the emergency work. We recently discussed this area of the law in *Adkins v. Inco Alloys International, Inc.*, 187 W.Va. 219, 417 S.E.2d 910 (1992), and came to this conclusion in Syllabus Point 4:

"In order to establish an implied contract right by custom and usage or practice, it must be shown by clear and convincing evidence that the practice occurred a sufficient number of times to indicate a regular course of business and under conditions that were substantially the same as the circumstances in the case at issue. Such a showing is necessary to demonstrate the parties' implied knowledge of and reliance on the custom or practice, an essential element of such a contract."

There was no attempt to proffer evidence to show that the safety conditions set forth in the written contract were traditionally understood to apply to emergency work. Even in the first case, *Pasquale v. Ohio Power Co.*, 186 W.Va. 501, 413 S.E.2d 156 (1991), where the right to express indemnity was at issue, this argument was not raised. The trial court granted Gallia's motion for summary judgment finding that the Power Companies were not entitled to summary judgment. In the first *Pasquale*, we concluded, under our stringent summary judgment principles, that there may have been a triable issue of material fact.

Under these circumstances, we find no merit in the Power Companies' assertion of error.

## VI.

## IMPROPER CLOSING ARGUMENT

■ The Power Companies further allege that the trial court erred when it refused to grant their motion for a mistrial based on improper remarks by plaintiff's counsel during closing argument. Specifically, the Power Companies contend that plaintiff's counsel impermissibly suggested to the jury that the value of the decedent's life was a proper measure of damages under our wrongful death statute, W.Va. Code, 55–7–6 (1989). The Power Companies contend that these comments are virtually identical to the ones we found impermissible in *Roberts v. Stevens Clinic Hospital, Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986), where we reduced the wrongful death verdict from $10,000,000 to $3,000,-000.

The term "value of the decedent's life" is somewhat of a misnomer. There is no question that W.Va.Code, 55–7–6, allows a jury to consider the economic, social, and emotional losses sustained by the decedent's beneficiaries resulting from his wrongful death.[26] To this extent, the jury is in effect setting a value on the decedent's life insofar as it relates to his or her beneficiaries.

■ What is impermissible is for counsel to argue to the jury that the decedent's life was worth a specific dollar amount when compared to other objects. For example, in *Jackson v. Cockill*, 149 W.Va. 78, 138 S.E.2d 710 (1964), plaintiff's counsel compared the worth of decedent's life to the $300,000 paid to purchase a racehorse, the $100,000 salary paid to a baseball player, the $14,000,000 spent in attempting to find Amelia Earhart, and the $100,000 ex-

---

**26.** W.Va.Code, 55–7–6, contained this language in 1987:

"The verdict of the jury shall include, but may not be limited to, damages for the following: (A) Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent; (B) compensation for reason-

ably expected loss of (i) income of the decedent, and (ii) services, protection, care and assistance provided by the decedent; (C) expenses for the care, treatment and hospitalization of the decedent incident to the injury resulting in death; and (D) reasonable funeral expenses."

pended to rescue Floyd Collins from a cave. We found counsel's argument improper, but did not reverse the verdict because the amount awarded was less than the maximum amount allowed under the wrongful death act. *See also Black v. Peerless Elite Laundry Co.*, 113 W.Va. 828, 169 S.E. 447 (1933).

This rule is simply an extension of the general damages rule that forbids plaintiff's counsel from making monetary comparisons that are not in evidence in order to inform the jury of an overall dollar amount it should return. We recognized this rule, but have indicated that such conduct may not necessarily be reversible error, but "must be judged in light of competent evidence of damages adduced and the trial court's admonition to the jury that statements of counsel were not to be considered as evidence." Syllabus Point 13, in part, *Abdulla v. Pittsburgh & Weirton Bus Co.*, 158 W.Va. 592, 213 S.E.2d 810 (1975). *See also Hewett v. Frye*, 184 W.Va. 477, 401 S.E.2d 222 (1990); *Bennett v. 3 C Coal Co.*, 180 W.Va. 665, 379 S.E.2d 388 (1989).

With this background, we consider whether plaintiff's attorney's closing remarks reached the level of *Roberts v. Stevens Clinic Hospital, Inc., supra*. We find substantial differences between the two cases. First, in this case, the plaintiff presented evidence of actual damages in addition to the funeral and related expenses. The plaintiff's expert testified about the loss of income suffered by the decedent's wife and minor children by using the decedent's work-life expectancy. The jury awarded the amount estimated by the plaintiff's expert. This dollar amount was not controverted by any expert offered by the defendants. In *Roberts*, the plaintiff did not offer any proof of economic loss.

Second, in *Roberts*, the entire emphasis on damages was anchored on asking the jury to consider the value of the decedent's life as it compared to objects with specific and substantial dollar values.[27] Here, plaintiff's counsel's first reference, to which no objection was made, was rather oblique.[28] The second reference by plain-

---

**27.** Representative excerpts from counsel's closing arguments in *Roberts* are as follows:

" 'When I was growing up, the kids used to say "Boy, that's valuable. That must be worth a million bucks." Well, as you know, in light of inflation, that same item might be worth ten million dollars today. Really, a million dollars isn't all that much anymore....

"If the race horse is worth $10,000,000, that's what the Roberts would be entitled to. It wouldn't be fair for us to come in and ask for $11,000,000 and it wouldn't be right, for the defense to say, "We only want to pay $9,000,000" and that case would be easy. Justice would require a verdict of $10,000,-000....

"Now if Michael were a race horse and the Stevens Clinic Hospital operated a veterinarian hospital and a race horse named Michael died as a result of the negligence of a veterinary doctor, you wouldn't have any trouble in returning a verdict for millions of dollars because you know that's what race horses are worth. You tell me, you tell the family, are horses entitled to better care than children? And are children less valuable than horses?
...

"Another guide tells you what, in modern day life, how high the value is placed on society is in the military. Millions and billions of dollars are spent on preventive measures. Why? To protect the life of the sol-

diers. If a military plane costing millions of dollars gets in trouble, what's the call? Get the pilot out. Let the plane crash....

"And what about our space program? I'm proud of our country. 225,000,000 people, but when we made the decision to go into space, a decision was made that not one single life would be sacrificed as a guinea pig. The decision was made that we would bring our astronauts back. And billions have been spent for all the safety devices to insure that they come back.' " 176 W.Va. at 499–500, 345 S.E.2d at 799.

**28.** Plaintiff's counsel stated the following at the beginning of closing arguments:

"In addition to the economic loss the Plaintiff and family are entitled to, she and the children are entitled to compensation for the loss of society and companionship caused by the tragic death of their father and her husband, Michael Pasquale.

"How can these be measured? How much is a father worth? How much is a husband worth? How much is a loving father and a loving husband worth? Some men are professional athletes, some men are movie stars. Some men make millions of dollars each year applying their skills. But these men are not necessarily good men or fathers and they are not necessarily the value that I am speaking of."

tiff's attorney was made in rebuttal.[29] The Power Companies did not make an objection at the time the statements were made.[30] After the plaintiff's attorney finished his closing argument, the Power Companies' attorney approached the bench and made a motion for a mistrial based on these statements. The court declined to grant a mistrial, and defense counsel did not request or offer an instruction advising the jury that it could not make an award based on the value of the decedent's life.

As we have previously indicated, there are substantial differences between this case and *Roberts v. Stevens Clinic Hospital, supra.* The improper remarks of counsel were much more attenuated here than in *Roberts.* Moreover, there was no evidence of sizeable economic losses presented to the jury in this case. Finally, defense counsel's failure to attempt to mitigate the amount of the verdict is also entitled to considerable weight.

 In considering any error relating to an excessive verdict, we deem certain factors important. First, we look to whether a prompt objection was made by defense counsel specifying the nature of the error. Along with this objection, defense counsel should take the obvious step of asking the court to instruct the jury to disregard the improper assertions. This factor is analogous to, although broader than, our traditional rule regarding improper argument by counsel set out in Syllabus Point 1 of *Black v. Peerless Elite Laundry Co., supra:*

" 'This court will not consider errors predicated upon the abuse of counsel of the privilege of argument, unless it appears that the complaining party asked for and was refused an instruction to the jury to disregard the improper remarks, and duly excepted to such refusal.' *McCullough v. Clark,* 88 W.Va. 22, 106 S.E. 61, pt. 6, syl."

 Second, we disfavor the technique of not first making a timely objection to the error and instead waiting until a later time to move for a mistrial. Mistrials in civil cases are generally regarded as the "most drastic remedy and should be reserved for the most grievous error where prejudice cannot otherwise be removed." *Seabaugh v. Milde Farms, Inc.,* 816 S.W.2d 202, 208 (Mo.1991). (Citations omitted). *See also Bryant v. Eifling,* 301 Ark. 172, 782 S.W.2d 580 (1990); *Fairfield County Trust Co. v. Murphy,* 6 Conn.Cir. 275, 271 A.2d 126 (1970); *Mayol v. Summers, Watson & Kimpel,* 223 Ill.App.3d 794, 166 Ill.Dec. 154, 585 N.E.2d 1176 (1992); *Davidson v. Davidson,* 19 Mass. App. 364, 474 N.E.2d 1137 (1985); *Clark v. Chapman,* 238 Va. 655, 385 S.E.2d 885 (1989).[31]

 We have traditionally held that a ruling on a motion for mistrial rests within the sound discretion of the trial court. As stated in Syllabus Point 4 of *Moore, Kelly & Reddish, Inc. v. Shannondale, Inc.,* 152 W.Va. 549, 165 S.E.2d 113 (1968):

**29.** In his rebuttal argument, plaintiff's counsel stated:

"I would ask on behalf of Daphne Pasquale—if this case were a suit—if Michael Pasquale had cut a line and burned up that Ingersoll–Rand motor, a piece of equipment made by Ingersoll–Rand Company, the motor to that pump. You saw it in the pictures. If he burned that motor up and we were here today and the Power Company was suing Michael Pasquale because we burned that motor up and we could have made $10,000,000 on that motor. We can't replace it. It's a machine and it's gone. If Michael Pasquale had hit a truck that was owned by the Power Company, they came in with an estimate of $20,000,000, but the machine was gone. I suspect if the evidence was there, you wouldn't have much

trouble assessing those damages. Think about it. Ingersoll–Rand made that pump. God made Mike Pasquale. Is his life worth any less than machinery or equipment? Do we think about it in any different way? I would submit that we don't. I would ask you to consider that."

**30.** Prior to trial, defense counsel did file a motion *in limine* to exclude the testimony and report of the plaintiff's economist, Dr. Sherman, as speculative and conjectural. The trial court properly admitted this evidence.

**31.** In criminal cases, the issue is more complex because a mistrial can implicate double jeopardy considerations. *See Keller v. Ferguson,* 177 W.Va. 616, 355 S.E.2d 405 (1987).

"Whether a motion for a mistrial should be sustained or overruled is a matter which rests within the trial court's discretion and the action of the trial court in ruling on such a motion will not be cause for reversal on appeal unless it clearly appears that such discretion has been abused."

*See also Board of Educ. v. Zando, Martin & Milstead, Inc.,* 182 W.Va. 597, 390 S.E.2d 796 (1990). Here, because of defense counsel's failure to make timely objections and request the jury to be instructed to disregard, coupled with the failure to timely move for a mistrial, we find the trial court did not abuse its discretion in denying the mistrial motion.

■ Aside from properly preserving objections and obtaining curative rulings from the court, factors to be considered when an excessive verdict is claimed are whether the defendant made any reasonable attempt to ameliorate the damages by cross-examination or by the defendant's own expert witnesses, and whether the defendant made a diligent effort to ensure that the jury was properly and adequately instructed on the damages issue. The defendant should offer instructions that advise the jury that the burden of proving the elements of damages rests on the plaintiff, and absent proof of any element, it may not be considered. *See Reynolds v. Pardee & Curtain Lumber Co.,* 172 W.Va. 804, 310 S.E.2d 870 (1983); *Sammons Bros. Constr. Co. v. Elk Creek Coal Co.,* 135 W.Va. 656, 65 S.E.2d 94 (1951). *See generally* 2 *Instructions for Virginia and West Virginia* § 26–133 (3d ed. 1987); 22 Am. Jur.2d *Damages* § 902 (1988 & Supp.1992).

Here, the Power Companies did not offer an instruction informing the jury that plaintiff's damages could not be measured by a value of life standard, i.e., that a human life is worth a given amount of money. Likewise, they did not offer any instruction relating to the plaintiff's burden of proof on damages.

■ Thus, in summary, where a defendant asserts that the plaintiff's damage verdict is excessive, before considering such assertion, we will examine the record to see if the defendant made a reasonably diligent effort to contest the damages.[32] From a review of this record, we find that the Power Companies virtually abandoned any reasonable effort to contest or properly object to the plaintiff's damage evidence and arguments.

For the foregoing reasons, we decline to hold that the verdict is excessive.

## VII.

## PREJUDGMENT INTEREST

■ Finally, the Power Companies argue that the trial court erred when it granted prejudgment interest on the decedent's potential future earnings. We agree, and, accordingly, we remand the case with instructions to the trial court to adjust the prejudgment interest award in accordance with the principles set forth herein.

At trial, the plaintiff introduced the testimony of Dr. Richard U. Sherman, an economist. Dr. Sherman testified about the decedent's potential wage earnings based on his age, education, and work experience. Based on these factors, Dr. Sherman concluded that the present value of the decedent's future earnings was $1,174,712. This amount included his potential earnings from the date of death on August 19, 1987, until trial, and what earnings he could have made had he lived an average life expectancy. The jury, apparently finding Dr. Sherman's analysis credible, awarded the plaintiff that amount for lost income plus $5,000,000 for loss of companionship, sorrow, and mental anguish. The trial court

---

**32.** This rule is not unlike the one set out in Syllabus Point 7 of *Miller v. Monongahela Power Co., supra:*

"We will not, in every case, refrain from sorting out errors involving prejudgment interest, but when the defendant fails to submit a special jury interrogatory asking the jury to set forth special or liquidated damages, this Court's attention to such errors is entirely a matter of grace and if the subject is deliberately obfuscated by counsel or error is invited, this Court will summarily dismiss the assignment."

then awarded prejudgment interest on the entire amount of lost wages.

On appeal, the Power Companies concede that it was proper to award prejudgment interest on the potential earnings from August 19, 1987, until trial, but contend that prejudgment interest should not have been awarded on future earnings after that date. We agree.

In *Bond v. City of Huntington,* 166 W.Va. 581, 598, 276 S.E.2d 539, 548 (1981), we explained that the purpose of awarding prejudgment interest is "to fully compensate the injured party for the loss of use of funds that have been expended." W.Va. Code, 56–6–31 (1981), specifically addresses what elements of damages may be awarded prejudgment interest:

> "Except where it is otherwise provided by law, every judgment or decree for the payment of money ... shall bear interest from the date thereof, ...: Provided, that if the judgment or decree, or any part thereof, is for special damages, ... the amount of such special ... damages shall bear interest from the date the right to bring the same shall have accrued.... Special damages includes lost wages and income, medical expenses, damages to tangible personal property, and similar out-of-pocket expenditures, as determined by the court." [33]

■ In *Grove v. Myers,* 181 W.Va. 342, 382 S.E.2d 536 (1989), we explained that prejudgment interest can be awarded for such damages from the date the cause of action accrued up until the date judgment is rendered, as we stated in Syllabus Point 3, in part:

> "Under *W.Va.Code,* 56–6–31, as amended, prejudgment interest is to be recovered on special or liquidated damages incurred by the time of the trial, whether or not the injured party has by then paid for the same."

■ In this case, the plaintiff was entitled to recover prejudgment interest on the decedent's lost wages from the date of his death until the date of the judgment on the jury verdict. However, the trial court did not calculate prejudgment interest for this period only, but calculated interest on the entire future wage loss. Clearly, the future wage loss accruing after the jury verdict is not a prejudgment loss or "special damage" under W.Va.Code, 56–6–31. This error does not warrant reversal of the entire case, but only requires a recalculation of the prejudgment interest by the trial court in accordance with the foregoing rule.

## VIII.

## CONCLUSION

Accordingly, the judgment of the Circuit Court of Mason County is affirmed in part, reversed in part, and the case is remanded with instructions to recalculate prejudgment interest in accordance with the principles stated herein.

Affirmed in part, reversed in part, and remanded with instructions.

---

**33.** The full text of W.Va.Code, 56–6–31, is:

"Except where it is otherwise provided by law, every judgment or decree for the payment of money entered by any court of this State shall bear interest from the date thereof, whether it be so stated in the judgment or decree or not: Provided, that if the judgment or decree, or any part thereof, is for special damages, as defined below, or for liquidated damages, the amount of such special or liquidated damages shall bear interest from the date the right to bring the same shall have accrued, as determined by the court. Special damages includes lost wages and income, medical expenses, damages to tangible personal property, and similar out-of-pocket expenditures, as determined by the court. The rate of interest shall be ten dollars upon one hundred dollars per annum, and proportionately for a greater or less sum, or for a longer or shorter time, notwithstanding any other provisions of law."